**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0378n.06

No. 12-3262

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Apr 16, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| ANTUN LEWIS, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before:  SUHRHEINRICH, MOORE, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.**  On May 21, 2005, a fire at 1220 East 87th Street ("1220 House"), a Section 8 rental home in Cleveland, Ohio, killed eight children and one adult.  One adult, Nicole Bell, was severely burned but escaped.  Another adult, Teon Smith, escaped without injury.  In connection with that fire, on October 1, 2008, Antun Lewis was charged with arson resulting in death, in violation of 18 U.S.C. § 844(i).  Lewis's case was tried before a jury in January and February 2011, culminating in a guilty verdict.  Lewis filed a motion for a new trial, asserting that the jury's verdict was against the manifest weight of the evidence.  On February 8, 2012, the district court granted Lewis's motion in a 95-page memorandum and order.  The United States filed a timely notice of appeal.  Because the district court did not abuse its discretion in ordering a new trial, we affirm.

I.

Lewis filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33, arguing that the jury's guilty verdict was against the manifest weight of the evidence. Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A motion for a new trial should be granted only "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) (internal quotation marks and citation omitted). When considering a motion for a new trial, the district court "may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Id.* at 593. Although we have not squarely addressed whether a district court may consider evidence not presented at trial when evaluating a Rule 33 motion, the district court in this case declined to consider evidence that was not admitted at trial.

We review a district court's grant of a new trial to a defendant under an abuse of discretion standard. *United States v. Sypher*, 684 F.3d 622, 626 (6th Cir. 2012). An abuse of discretion occurs when we are persuaded that a mistake has been made due to the district court's reliance on "'clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.'" *United States v. Allen*, 619 F.3d 518, 523–24 (6th Cir. 2010) (quoting *Ross v. Duggan*, 402 F.3d 575, 581 (6th Cir. 2010)). We have noted that the district court is entitled to a great deal of deference in appellate review of Rule 33 motions, given that "'the trial judge, not an appellate court reading a cold record, can best weigh the errors against the record as a whole to determine whether those errors in the conduct of the trial justify a new trial.'" *United States v. Breinig*, 70 F.3d

850, 851 (6th Cir. 1995) (quoting *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir. 1988)).

However, we have also recognized that this deferential standard must be weighed against the fact

that new trial motions "are disfavored and should be granted with caution." *United States v. Willis*,

257 F.3d 636, 645 (6th Cir. 2001). We do not second-guess the district court's credibility

determinations, but review only for a "clear and manifest abuse of discretion." *United States v.*

*Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003) (internal quotation marks and citation omitted). In

this case, the district court carefully and thoroughly reviewed the voluminous transcript, evaluated

the credibility of government and defense witnesses, and did not abuse its discretion in granting

Lewis's motion for a new trial.

## II.

Lewis was convicted under 18 U.S.C. § 844(i), which provides that "[w]hoever maliciously

damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any

building, vehicle, or other real personal property used in interstate or foreign commerce or in any

activity affecting interstate or foreign commerce" has committed a federal crime. At trial, the

government presented three primary categories of evidence: Marion Jackson's eyewitness testimony,

the testimony of inmate informants regarding statements made by Lewis while incarcerated, and the

testimony of other witnesses who knew Lewis in the community and had knowledge relating to

Lewis's possible motives for committing the arson. Marion Jackson's testimony provided the most

direct and comprehensive account of Lewis's involvement of the arson. However, the district court

found his testimony internally inconsistent, unreliable, and lacking corroboration. The inmate

informants purported to have heard Lewis incriminate himself in the arson, but the district court

found significant the fact that the informants were all connected in some way to an inmate who had received prior benefits from ATF. Moreover, the court discounted their testimony because the inmate informants' stories were uncannily similar in superficial ways and were not corroborated by witnesses who knew the residents of the 1220 House. The community witnesses, including Samantha Collins, George Hightower, Carmella Smith, and Charise Frazier, testified to statements Lewis made about the fire and his possible motives for setting the fire. The district court concluded that the credibility of these witnesses was undermined by their initial unwillingness to provide their statements to law enforcement and the lack of corroboration of their stories through Lewis's phone records. When evaluating the record as a whole and acting as the thirteenth juror, the district court's concerns about the credibility of Jackson, the inmate informants, and the community witnesses call into question a large portion of the government's proof. As a result, the district court found that these inconsistencies called into question the likelihood that Lewis was the arsonist and weighed heavily against the jury's guilty verdict. Viewed in this context, we discuss the evidence relied upon by the district court and the government's arguments of error.

A.

At trial, the government's key witness was Marion Jackson, who testified that he was Lewis's accomplice in the arson and the only eyewitness to the crime. At the time of the fire, Jackson was fifty-five years old and had a thirty-year criminal record, including multiple theft crimes. He had a sixth-grade education and spent half of his life between state hospitals and prisons. Jackson suffers from post-traumatic stress disorder, bipolar disorder, mild depression, high blood pressure, diabetes, and heart disease.

-4-

Jackson testified that he met Lewis through Samantha Collins,[1] a prostitute. He noted that he first met Lewis while walking with Collins to buy drugs. Jackson testified that Lewis wanted to know more about him and that he described his criminal record to Lewis. Jackson explained that he and Lewis spoke several more times and that Lewis eventually asked him to "pick up an envelope and bring it to him," which Jackson viewed as a "test." Two days before the fire, Jackson testified that Lewis offered Jackson $1,500 to set a house on fire "because somebody owed him some money." The money was "either for drugs or something."

Jackson testified that Lewis called him on the night of May 20, 2005, and asked that Jackson meet him on the east side of Cleveland and wear dark clothing. Jackson could not recall Lewis's phone number or his own phone number at the time of the fire, so these phone conversations could not be corroborated by Lewis's cell phone records.[2] Jackson traveled by bus to the east side and got off on Superior Avenue near East 85th Street at around 9:30 p.m. He testified that he could be mistaken about his arrival time because he did not have his watch and it was dark outside. Jackson said that Lewis did not appear to have a van or other vehicle with him. He and Lewis shared a beer for a few minutes and then began walking down East 87th Street toward Kosciuszko Avenue. Jackson testified that he saw about twenty people at a party in an open lot on East 87th Street. Soon

---

[1]At the time of trial, Samantha Collins had married and used the name Samantha Collins-Taylor. We refer to her as "Collins" throughout this opinion.

[2]For the first time at trial, Jackson testified that Lewis had two cell phones. Multiple witnesses corroborated the fact that Lewis had one or two cell phones, including Sharese Williams and Joan Davis. The government produced records at trial only from one cell phone belonging to Lewis.

thereafter, Lewis pointed out the 1220 House as the one he wanted to be set on fire. Jackson refused to set the fire but agreed to serve as a lookout because he feared what Lewis would do if he did not agree to be a lookout.

Jackson then testified that he and Lewis walked back toward Superior Avenue, where Lewis picked up one metal gas can and one plastic gas can. Jackson said that he watched Lewis purchase $5 of gasoline. At trial, Jackson testified that Lewis actually purchased the gasoline at a Citgo station on Superior. Initially, in September 2005, he told officers that Lewis purchased gasoline on East 79th Street and St. Clair. No gas station was at that intersection, as Jackson later learned when ATF agents drove him there. Jackson testified that he and Lewis continued walking and that Lewis received a phone call, which he answered by saying, "Is the bitch Nicole in the house?" At that point, Jackson claimed that Lewis picked up his pace and started heading toward the 1220 House. Jackson served as a lookout while Lewis disappeared between the 1220 House and a neighboring house. Jackson then testified that he saw flames coming out of a window and from underneath the front door. At that point Jackson left, looking back to see "Antwan . . . standing right there." Jackson testified that the individuals at the party immediately reacted to the fire and ran over to the house. He claimed that he vomited on the bus back to the west side of Cleveland.

A few months after the fire, Jackson was arrested on unrelated charges of kidnapping, aggravated burglary, and attempted felonious assault. At that time, Lewis was imprisoned in the same county jail as Jackson, also on charges unrelated to the fire. Jackson told officers that in the jail Lewis said that "he had beaten the girl before he set the fire," and that Lewis claimed to have

beaten the girl to throw off investigators. Jackson also said, however, that he had not had any conversations with Lewis during their detention at that county jail.

For six weeks during his detention, Jackson testified that he shared a "jail pod" with Paul McKeever. McKeever had received benefits from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in prior investigations. While in jail, Jackson watched a televised news story about the fire and became emotional. When approached by McKeever, he told McKeever that he knew something about the fire. McKeever told Jackson to speak with Fire Marshal Ray McCarthy and ATF Special Agent John Gregg and put Jackson in contact with the officers. Jackson began talking to the agents on September 30, 2005, telling them that he overheard details about the fire from other inmates. Later in the interview, he began crying and told the officers that he had been involved in the fire.[3] Jackson eventually received use immunity for his testimony, as well as $14,000 in housing funds, $5,800 for food rations and medications, and approximately $300 for storage and moving expenses.

The district court's determination that Jackson was not entirely credible was a significant factor in its decision to grant a new trial. The district court noted that "several aspects" of Jackson's testimony were "deeply troubling," including Jackson's numerous inconsistent statements to law enforcement and the inconsistency between his earlier statements and trial testimony about the location of the gas station, all of which Jackson described as "miscalculations." The court also questioned Jackson's purported close relationship with Lewis, given that Jackson could not produce

---

[3]Lewis was not indicted until three years after Jackson implicated him in the crime.

phone records showing calls to or from Lewis and Lewis's phone records did not show calls to or from Jackson.

Apart from these inconsistent statements, which were the core of the district court's concern about Jackson's credibility, the district court addressed a number of other questionable aspects of the testimony. First, the district court discussed Jackson's testimony that he vomited on the bus after leaving the scene of the fire. At trial, Lewis called Ricky Chapman, who served as manager of service quality for the Greater Cleveland Regional Transit Authority, as a witness. Chapman testified that the bus service's protocols require bus drivers to notify headquarters to request an interior wash when a customer becomes ill on the bus. Here, no such call was made. However, the bus Jackson claimed to have taken on the night of the fire was *en route* to the garage for its nightly cleaning. Although this cleaning would not necessarily include an interior wash and a driver may face discipline for failing to report passenger illness, the court concluded that this issue was not "particularly damaging to Jackson's credibility."

The district court then addressed the conflict between Jackson's testimony and Bruce Thomas's testimony. Thomas was an eyewitness to the fire and a resident of Superior and 86th Street, in the same neighborhood as the 1220 House. Thomas testified that he had been with friends at a bar, having "a couple [of] cocktails," until approximately 2:15 a.m. At that point, he and his friends stood outside of his friend's grandmother's house on 87th Street and Superior, across the street from the 1220 House. At about 2:30 or 2:35 a.m., Thomas testified that he and his friends noticed the fire. Thomas testified that there was no party at the place specified by Jackson and that he did not see anyone walking in or out of the 1220 House around the time of the fire. The district

court noted Thomas's familiarity with the neighborhood and the fact that he gave a statement to law enforcement "just a few days after the fire" as reasons for crediting his testimony over Jackson's. Further, the court noted that the government did not call any of the alleged party attendees to corroborate Jackson's testimony and found it unlikely that a party of twenty people would have escaped Thomas's view. Therefore, the court concluded that Thomas's testimony brought Jackson's credibility into doubt.

Next, the court considered Jackson's testimony that people in the 1220 House owed Lewis money. Jackson, Daniel Id'Deen, Cyle Watson, Christopher Myers, and Samantha Collins all testified that Lewis told them that people in the 1220 House owed him money for drugs. However, those witnesses who knew the family at the 1220 House well testified that none of them were drug users or engaged in drug activity. The court noted that those witnesses who did not personally know any of the residents testified to Lewis's purported drug motive, and their testimony was contradicted by those who knew the family well. It viewed the government's failure to impeach those witnesses as indicative that the credibility of the "drug debt" motive, and therefore Jackson's testimony, was in question.

Finally, the court addressed the timeline of events as described by Jackson and as reflected in Lewis's cell phone records. Jackson initially told officers that he received a call from Lewis around 7:15 or 7:30 p.m., instructing him to come to the east side of Cleveland. He said that he was continually with Lewis from 9:10 p.m. until around 2:30 a.m. At trial, Jackson testified that he was with Lewis continually from around 9:30 p.m. to the time of the fire. However, on cross-examination, when confronted with Lewis's cell phone records during the time period placing him

four miles from the fire, Jackson testified that he was with Lewis for only fifteen or twenty minutes. The phone records also show Lewis making numerous phone calls between 9:15 p.m. and 1:40 a.m., but Jackson recalled only one phone call, in which Lewis asked the caller whether the "bitch Nicole" was in the house. Although Lewis's cell phone records placed him in the same sector as the 1220 House at the time of the fire, the district court did not attach great weight to this fact, as the sector covered a large area of sixteen city blocks, encompassing an area where Lewis regularly associated with family and friends, including George Hightower and Lewis's mother.

The court then discussed Jackson's incentive to lie, noting that Jackson received numerous benefits from ATF, including money for housing and living expenses, as well as use immunity for his testimony. The court also recognized that Jackson came to know the agents through Paul McKeever, who had received benefits from ATF in prior investigations, and that ATF agents were present at some of Jackson's key hearings on his own charges.

In summation, the court found Jackson's testimony to be "significantly undermined" by numerous discrepancies, in prior statements and between prior statements and trial testimony, and the lack of corroborating testimony or evidence.

B.

Various inmate informants testified about statements Lewis allegedly made to implicate himself in the arson. Paul McKeever, a recidivist offender who was serving a sentence for gross sexual imposition, failure to register his sex offender status, and failure to report to a parole officer, was connected in some way to all of the other inmate informants. He had been an informant in numerous other cases.

McKeever testified that in May 2005, when he and Lewis were both inmates at the Cuyahoga County Jail, he overheard Lewis tell another inmate that "they didn't have nothing on him and not to worry about it" and that "the bitch deserved what she got and that they didn't have nothing on him." He also testified that in September 2005, he encountered Marion Jackson. Jackson was watching a television news story on the fire very closely. When approached by McKeever, Jackson told him that he knew the man who committed the arson, initially telling McKeever that he knew Lewis through Collins.

Lewis was eventually transferred at ATF's request to Grafton, the correctional institution where McKeever was then incarcerated, so that McKeever could seek information from Lewis. McKeever testified that he and Lewis developed a friendship and that he told Lewis that he knew Collins in order to gain Lewis's trust. McKeever testified that Lewis said he was worried about Jackson and mentioned "a girl named Nicole." Shortly thereafter, McKeever testified that Lewis came to him, asking if McKeever was serious about making money together after they were released. McKeever then showed Lewis a fake bank statement showing that he had $1.9 million in a bank account, and Lewis confided in McKeever, telling him that he set the fire. McKeever testified that Lewis told him about Jackson's involvement as a lookout and that Lewis was saddened that children died in the fire. Later, in July 2006, McKeever testified that Lewis began yelling out McKeever's name and threatening him. McKeever admitted to receiving benefits from ATF for his testimony and cooperation in prior cases, including an arson case in which he claimed, as in this case, that the arsonist confessed to him in prison, telling McKeever that he did not mean to kill anyone and that the fire was set to kill a particular "bitch."

Daniel Id'Deen testified that he overheard conversations between McKeever and Lewis, in which Lewis said that he was worried about Jackson, who had served as a lookout. He heard Lewis say, "I didn't know the kids was there. It wasn't meant for them. It wasn't meant for the bitch Nicole."[4]

Richard Wheeland testified to overhearing Lewis tell McKeever that he was worried about Jackson and that people in the 1220 House owed him something. He heard Lewis say, "[i]t was either that or shoot the bitch" and "it wasn't intended for the kids, it was meant for Nicole."

Anthony Collier testified that he heard Lewis incriminate himself by yelling out of an air hole in his cell door in the segregation unit. Collier said that he heard Lewis yelling about a girl named Nicole and threatening a man named Paul.

Cyle Watson testified that he heard Lewis say, "you know, I killed a bitch." When Watson asked why, Lewis responded that "she ripped him off with some dope and [Lewis] torched her house." Lewis added, "I know that she died and I know there was a bunch of kids, and I don't give a fuck about the bitch, I care about the kids, I feel bad about the kids." Watson also testified that Lewis was worried about Jackson. Watson claimed to have had these conversations with Lewis between October and December 2006, but did not speak with agents until August 2008, after he was housed next to McKeever.

---

[4]This appears to be a transcript error. A more logical reading, consistent with the testimony of Richard Wheeland, would be: "I didn't know the kids was there. It wasn't meant for them. It *was* meant for the bitch Nicole."

Christopher Myers testified that Lewis told him in 2007 that he was offering money to "shut old boy [Jackson] up." He then confessed to Myers, telling him that "some girl had owed him money and he was going to go take care of it one way or the other and I guess they was supposed to set the mother fucker on fire." Lewis told Myers that Jackson was supposed to set the fire, but refused, leaving Lewis to set it himself. A few months after this conversation, Myers testified that he asked Watson for advice. Watson advised Myers to speak to the sergeant at the prison where they were incarcerated.

Evaluating the testimony of the inmate informants, the district court noted that each witness had a connection to Paul McKeever at the time of his statement. McKeever either shared a cell or was in the same jail pod as Id'Deen, Wheeland, Collier, Watson, and Myers. Although all of the informants maintained that ATF did not make any promises to them in exchange for their statements or testimony, the court recognized that a state prosecutor spoke on McKeever's behalf at his most recent sentencing hearing regarding his cooperation and that Agent Gregg wrote a letter on Collier's behalf to the parole board.[5] The court noted that some of the informants' criminal backgrounds raised doubts about their character for truthfulness. The court also observed that Id'Deen and Collier

---

[5] Agent Gregg wrote the witness statements for Jackson, McKeever, Id'Deen, Watson, Myers, Collier, Wheeland, and Collins. Gregg arranged for Lewis to be transferred to McKeever's prison and deposited money into McKeever's commissary account to allow McKeever to seek information from Lewis about the fire. There was also unrebutted testimony about Gregg's intimidation of witness Teon Smith and suggestions of his intimidation of witness Nicole Bell. The district court noted all of this but did not use the accusations against Gregg as evidence that weighed against the verdict.

both admitted learning about the fire from the news. It found particularly incredible Collier's testimony that Lewis incriminated himself by yelling loudly in the segregation unit.

The district court also observed that the informants' stories were uncannily similar. Several of the informants noted that Lewis said he did not mean to kill kids, that he mentioned a woman named "Nicole," that he mentioned "Pops" (Jackson), and that the arson was motivated by a drug debt. In evaluating this testimony, the district court noted that it conflicted with the testimony of the relatives and friends of the residents of the 1220 House.[6] The inmate informants testified alternately that Lewis set the fire because of jealousy or because he was owed a drug debt. However, the witnesses who knew the residents well disavowed any dispute between Lewis and the residents of the house. No witness other than the informants could identify any resident in the house who used drugs or may have purchased drugs from Lewis. Bell was a nursing student who denied any drug involvement, testimony corroborated by all other witnesses who knew her. Bell testified that even though Lewis tried once to kiss her and was rebuffed, he had displayed no signs of jealousy or a desire to seek revenge. The district court found that the lack of external corroboration of the inmate informants' testimony, coupled with its extreme internal consistency, rendered the testimony less

---

[6]Bell testified that Agents Gregg and Illig accused her of owing Lewis money for drugs. Teon Smith, who had been living in the basement of the 1220 House on the night of the fire, testified that he awoke to people yelling, "fire, fire," and that he took Bell out of the house after an unsuccessful attempt to rescue other members of the family. At trial, Smith testified that Gregg interviewed him for eight hours and threatened and "coerced" him into implicating Moses Marshall, Medeia Carter's live-in boyfriend at the time of the fire. Smith repudiated the statement he made to Gregg and the government did not cross-examine Smith. The district court found Smith and Bell's testimony to be credible but, as previously noted, did not use the accusations against Gregg as evidence that weighed against the verdict.

credible and highlighted the connection of all of the informants to McKeever and readily available media coverage of the fire.

The government argues that the district court improperly required the government to prove Lewis's motive in committing the arson. However, careful review of the district court opinion demonstrates that the court looked at various reported motives attributed to Lewis solely for the purpose of evaluating the credibility of testifying witnesses. Credibility is an appropriate consideration for the district court in its role as the "thirteenth juror," tasked with determining whether evidence weighs heavily against the verdict. *Hughes*, 505 F.3d at 593. The government's allegations of error amount to nothing more than a disagreement with the district court's credibility determinations—determinations that we do not second-guess unless the district court committed a clear abuse of discretion. *Solorio*, 337 F.3d at 589 n.6. The government's arguments do not persuade us that the district court overstepped or abused its legitimate authority to evaluate the credibility of the inmate informants.

## C.

The district court also considered other testimony from witnesses who knew Lewis and Lewis's own statement.

## 1.

Samantha Collins, a former prostitute and cocaine addict from the west side of Cleveland, testified that she bought drugs from Lewis and allowed him to stay at her house in 2005 to cook crack cocaine, shower, and have sex with women. She testified that shortly before the fire, Lewis told her that he was upset about a drug debt and would burn those who owed him money. She said

that "he had made threats that he was going to shoot them, but there was too many to shoot, so he would burn them all out." Collins testified that in the month before the fire, Lewis was at her house one to two times per day. However, Lewis's cell phone records never show that he was on the west side of Cleveland during that time frame. Collins testified for the first time at trial that Lewis had two cell phones during this time period. Collins testified that Lewis went to the house where people owed him money and banged on the door. However, the surviving residents of the 1220 House denied that Lewis was in a dispute with the family or that he had sold drugs to anyone in the house.

The district court noted several factors that detracted from the credibility of Collins's testimony. First, Collins never approached law enforcement to give her statement; rather, law enforcement found her and asked for her statement on July 6, 2006. Thereafter, ATF provided Collins with $1,000 in moving expenses. Second, although Jackson testified that he met Lewis through Collins, Collins never mentioned Jackson in her testimony. Finally, the district court noted that even Collins was connected to McKeever, as Collins's ex-husband, Jeffrey Janosek, was indicted of stealing a car with McKeever in 1992. Collins claimed not to know of this connection.

2.

George Hightower, with whom Lewis was living for a week before the fire, also testified at trial. He described Lewis as being upset that Sharese Williams, who was a maternal figure in Lewis's life, had stolen his clothes.[7] Hightower testified that he told Lewis, "if I was you, I'd burn

---

[7]This subplot is somewhat complex and requires some explanation. In her testimony, Sharese Williams explained that she posted bond for Lewis on charges for which he failed to appear in court. Frustrated at his delinquency at her expense, Williams stole Lewis's clothes from his mother's home in an attempt to force Lewis to visit Williams's home. When Lewis arrived at Williams's home to

the house down." On the morning after the fire, around 3:04 a.m., Hightower called Lewis twice without a response. Shortly thereafter, Lewis drove into Hightower's driveway at a high rate of speed. Hightower called Lewis, and Lewis asked him to come open the door. As Hightower approached Lewis's van, he noticed an odor of gasoline emanating from inside. Hightower admitted that a week before the fire, he gave Lewis a can of fuel treatment, which could have accounted for the odor.

Hightower testified that he and Lewis heard people next door state that Moses Marshall's house was on fire and they could not find him. Hightower told Lewis that the fire must have been on Decker Street, where Marshall's grandmother lived. Hightower testified that Lewis corrected him, telling him that the fire was on 87th Street. Hightower described Lewis as having "something on his mind." After making phone calls, Lewis learned that Shauntavia, a girl he considered to be a cousin, perished in the fire.[8] Lewis began crying. Hightower then went to a nearby store and spoke with someone about the fire. When Hightower returned, he confronted Lewis about hearing

---

retrieve his clothes, Williams planned to contact law enforcement to arrest Lewis. Hightower explained that Lewis was very upset when he learned what Williams had done.

[8]The district court also took into account the parties' arguments about Lewis's knowledge of the fire and when Lewis first learned of Shauntavia's death. Myesha Glass, who was an acquaintance of Lewis's and lived across the street from the 1220 House, testified that Lewis called her at 4:50 a.m. and asked her what she was doing. Glass testified that she told Lewis about the fire and that Sharese was devastated over the loss of her daughter. Glass testified that Lewis responded that Glass was lying. Sharay Williams testified that Lewis first heard of Shauntavia's death from her at 6:04 a.m. However, the district court correctly noted that Lewis could have been aware of the fire, but unaware of its magnitude, before his call with Sharay. In any case, these discrepancies do not weigh in favor of or against the guilty verdict returned by the jury.

accusations that Lewis had set the fire, to which Lewis responded, "You're talking crazy shit, you're talking crazy shit" and walked out of the house.

On May 22, 2005, Hightower was interrogated at the police station. He did not describe the smell of gasoline and did not tell the officers that Lewis corrected his mistake regarding the location of the fire. Hightower admitted that he was interviewed thirty or forty times and never revealed this information. In June 2010, ATF agents allowed Hightower to review his previous reports, at which time Hightower became frustrated "because the conversation went like, no, this isn't my statement; no, I didn't say this; no, why is this marked out?"

In evaluating Hightower's credibility, the district court noted that Lewis's phone records show thirty-two phone calls from Hightower to Lewis, including calls at times when Lewis should have been at Hightower's home, according to Hightower's account. The court also noted that Hightower did not provide significant details of his testimony to law enforcement over the course of many interviews. Moreover, to the extent that Hightower suggested that Lewis set the fire to exact revenge on Williams, the court noted that Williams did not live at the 1220 House, Lewis knew where Williams lived, and Lewis knew that Shauntavia Williams, to whom he was particularly attached as a "play-cousin," was staying at the 1220 House at the time of the fire. Therefore, the district court found less credible Hightower's testimony that Lewis set the fire out of anger at Sharese Williams.

3.

The government also presented the testimony of Carmella Smith and Charise Frazier, two cousins who had purchased marijuana from Lewis approximately twice a week during the three-month period preceding the fire. Another cousin of Frazier's reached out to law enforcement, posing as Frazier, three years after the fire. Law enforcement officers then contacted Smith and Frazier, who ultimately gave statements to them. Smith testified that she had grown up in the same neighborhood as Lewis and that she and Frazier purchased marijuana from Lewis shortly after the fire, smoking with him in his van. While they were together, Smith testified that Lewis told her he was upset because a woman "wouldn't give him" his "dope and clothes and stuff." Smith testified that Lewis said that he had been using ecstasy and PCP "because he was fucked up about the fire." Smith also testified that Lewis said "the news [was] lying, she was burned from the waist up, not the waist down" and "they wouldn't find the keys." Smith testified that she asked Lewis how he knew these details and Lewis "gave [her] a strange look." Smith testified that Lewis said that "it was only the one that died and the one that got burned, and that he didn't know there was no kids in the house." Smith testified on cross-examination that Lewis never told her that he had set the fire. She also testified that Lewis told her that "the person that told him about the fire told him" these details.

Charise Frazier testified that when she and Smith were with Lewis in his van, Lewis "looked like he had been up for days, and he looked like he was real high, like off drugs or something." Frazier also testified that Lewis "wasn't acting like he would normally act . . . [l]ike he was going through something maybe." She testified that Lewis was upset about a woman taking his clothes, that he talked about a car being moved, and that he repeatedly said, "she should have used a

condom," without explaining who "she" was. Frazier testified that she received a letter from Lewis, dated July 14, 2009, after she had given her statement to law enforcement. She testified that she found this letter unusual because she was not in regular contact with Lewis and had received the letter at a home she had moved to since she had last seen Lewis. In the letter, Lewis wrote:

> The reason [I'm] writing you is, because as far as I know we always been cool plus . . . I know you ain't going for that bull-shit these white people tryin to put out there bout the kid and I just need a good friend in my life right now. Somebody that's go keep it one-million with a real nigga no matter what. I know [I'm] askin for a lot — I'm asking for a lot, but if you a "G" like I think you is then it ain't go be shit for you to fuck with a nigga of my caliber. But on another note, what's really good with chu.? I remember we was just smokin in my van the night I got locked up. Shit ill I ain't seen the streets since. Right now I got like 3 months to go. [I'm] still fighting this bull-shit ass case, but it's looking good for the kid. I just let God take care of it why I hold my end down by maintaining and tryna stay under the radar why [I'm] in here. Anyway how yo peeps doing? If you talk to them tell them I said wuz good. Well, [I'm] bout to end this letter. Be good Ma and make sure you get back at me. One Twon. PS. I hope we can build something. Ma. I remember we had our lil thing going on on the young side. Ha. Send a nigga a flick of yoself. Okay.

Frazier also testified on cross-examination that Lewis never told her that he had set the fire. Frazier and Smith both admitted at trial that they did not have clear recollections of the details of their conversation with Lewis.

The district court observed that Frazier and Smith did not provide statements to law enforcement until three years after the incident in the van was said to have occurred. The court also noted that all three participants in the conversation had been using marijuana and that Smith "wavered" when asked whether she was intimidated by ATF agents when she gave her statement to law enforcement. Moreover, the testimony of both Smith and Frazier was ambiguous—it could be seen either as "a manifestation of [Lewis's] guilt" or his distress "regarding the loss of life in the

fire." The district court ultimately did not view this testimony as providing corroboration of Jackson's testimony or clarity regarding the credibility issues that undermined the jury's verdict.

4.

On May 31, 2005, Agent Don Illig interviewed Lewis for approximately thirty minutes about the fire. During that interview, Illig testified that Lewis told him that on the night of the fire, he went to George Hightower's house to pick up a compact disc. From there, Lewis parked his van in a housing project in Cleveland, known as "the Browns," listening to music, smoking marijuana, and taking a half tablet of ecstasy. Illig's report indicated that Lewis was at the Browns from approximately 2:30 to 3:00 a.m. Lewis told Illig that he received calls from Sharese and Sharay Williams while he was at the Browns and that he held the cell phone up to the music instead of talking to them. At some point, Lewis told Illig that two vehicles pulled into the parking lot of the Browns and made him nervous, so Lewis returned to Hightower's house. Agent Illig took handwritten notes of Lewis's statements during the interview and created a typed report nine days later. At trial, Illig admitted that significant details appeared in his typed report that were not included in his handwritten notes, including the times at which Lewis claimed to be in the parking lot at the Browns. The district court noted that the lack of timelines in Illig's handwritten notes calls into question whether Lewis's alibi was false, given that Lewis's phone records show calls to and from Sharay and Sharese Williams while Lewis was in the sector encompassing the Browns at approximately 4:00 a.m.

III.

The district court properly evaluated the weight and credibility of all of the evidence adduced at trial and its determination that the verdict was against the manifest weight of the evidence was not an abuse of discretion. Sitting as the thirteenth juror, the district court did not abuse its discretion in concluding that many government witnesses, including Jackson, the inmate informants, and community witnesses testifying to Lewis's involvement and possible motive, were incredible. The district court addressed internal inconsistencies in Jackson's testimony and noted that many questions were left unanswered regarding the timeline provided by Jackson and records of Lewis's alibi statement. It raised questions of bias on behalf of the inmate informants, noting that the informants' testimony was eerily consistent in superficial ways and uncorroborated by other witnesses in material ways. Finally, the court noted doubts raised by the initial reticence of community witnesses to provide statements to law enforcement as well as individualized credibility questions related to the testimony of these witnesses. Although we make no statement as to whether such proof could sustain a guilty verdict, we hold that the district court did not abuse its discretion in determining that the guilty verdict in this case was against the manifest weight of the evidence. In light of our deferential review of orders granting motions for a new trial, the district court's thorough and thoughtful review of the evidence, and its superior position to evaluate the credibility of witnesses, we affirm the judgment of the district court.