NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0050n.06

No. 14-3502

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jan 15, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ANTONIO RAY,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

OPINION

BEFORE: MERRITT, STRANCH, and DONALD, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** A jury convicted Antonio Ray of possessing a firearm after he was previously convicted of a felony offense. 18 U.S.C. § 922(g). Ray now appeals his conviction and the district court's denial of his motion to suppress the firearm. Finding no reversible error, we AFFIRM.

## I. FACTS

### A. The Suppression Hearing Evidence

On June 11, 2013, at approximately 1:46 a.m., Ray was driving northbound on West 25th Street in Cleveland, Ohio, in a red Dodge Stratus. Two Cleveland police officers patrolling the high-crime area, Officers Brian Middaugh and Michael McNeeley, passed Ray in a marked police car as they drove southbound on West 25th Street. The officers observed that the Dodge Stratus did not have any visible mirrors, a violation of traffic law. Officer Middaugh turned the

police car around and followed Ray to investigate further, but he did not activate his lights or siren. There were no other cars in the vicinity. R. 34 Page ID 143–46, 156.

At the corner of West 25th Street and Sackett, Ray turned left and drove westbound on Sackett. The officers followed approximately ten to twenty feet behind him to the intersection of West 30th Street and Sackett, which was controlled by a stop sign. As Ray approached the intersection, he drove in the middle of the road, "blew clearly through the stop sign" without touching the brakes, and accelerated as he turned left onto West 30th Street. Having witnessed Ray's failure to obey the stop sign, Officer Middaugh activated his lights and siren and followed Ray on West 30th Street. Officer McNeeley confirmed that Officer Middaugh did not activate the lights and siren until after Ray failed to obey the stop sign. *Id.* at 189–90.

Ray abruptly stopped his car on the wrong side of West 30th Street adjacent to an apartment building. Officer Middaugh stopped the police car ten to fifteen feet behind him. The scene was illuminated by a streetlight and the police car's headlights. *Id.* at 146–51.

Officer Middaugh jumped out of the police car and approached the driver's side of the Dodge Stratus. Ray got out of his car and faced the officer. In that moment, Officer Middaugh could see the top half of a handgun that Ray was holding in his waistband. Officer Middaugh identified himself as a police officer and continuously yelled "gun!" to alert Officer McNeeley that he feared for their safety. Ray took one step forward to avoid his car door and then fled on foot through a lot next to the apartment building. *Id.* at 151–54. After Ray was apprehended, the police recovered a 9 millimeter Jimenez handgun and a magazine from separate locations on the lot.

Ray testified that he first noticed the police car when it passed him moving southbound on West 25th Street. He saw the lights come on as the police car made a u-turn to follow him.

When he reached the intersection of West 30th Street and Sackett, he knew the police car was still behind him with its lights on, but he thought the car was heading to a call; he did not think the police were after him. After stopping completely at the intersection of West 30th Street and Sackett, he turned left onto West 30th Street. As he made the turn, the police car followed him, and he heard the siren for three to five seconds as both cars rolled to a stop. He ran from the police because he did not have a driver's license and he was on probation, but he denied possessing a handgun. He held his cell phone and the waistband of his pants because he did not have a belt. *Id.* at 163–70, 174–75, 183.

Based on this and other evidence, the district court determined that the officers' testimony was more credible than Ray's. R. 38 Page ID 235. The court found that Officer Middaugh did not activate the police car's lights and siren until Ray failed to obey the stop sign, and at that point the officers had probable cause to instigate a traffic stop. *Id.* The court denied Ray's motion to suppress the handgun and magazine. *Id.* at 237.

## B. The Trial Evidence

Because the central issue at trial was whether Ray possessed the handgun and the magazine, the evidence on this point was developed more thoroughly than it was at the pretrial suppression hearing. Officer Middaugh testified that he was standing approximately one car length away when Ray stepped out of his car at the scene of the traffic stop. In the light of the streetlamp and the police car's headlights and takedown lights, he saw a silver gun with a black handle that Ray was holding with his right hand in the waistband of his pants. Officer Middaugh screamed "gun" several times to Officer McNeeley, drew his firearm, and chased Ray as he fled across the lot adjacent to the apartment building. Officer McNeeley could not see the handgun in Ray's waistband from his standing position near the passenger door of the police car. As Officer

Middaugh chased Ray on foot, Officer McNeeley jumped into the police car and drove to the far side of the lot to intercept Ray if he eluded Officer Middaugh. R. 53 Page ID 430–31,445, 455–56.

During the foot chase, Officer Middaugh focused his attention on Ray's right hand to be ready if Ray turned around and started shooting. He did not see Ray throw anything, and he did not see anything fall from Ray's body during the chase. When Ray tripped near the far edge of the yard, Officer Middaugh caught him and frisked him for weapons. Not finding any on or beneath Ray's body, he handcuffed Ray and walked him to the waiting police car. Retracing Ray's path of flight as they walked, Officer Middaugh found a 9 millimeter magazine approximately ten feet from the point of Ray's apprehension. He placed Ray in the police car and then retrieved the magazine. *Id.* at 431–33, 440–42, 445, 448.

By that time, other officers had arrived to provide backup assistance, and Officer Middaugh alerted them to the recovered magazine and the missing gun. According to Officer Higinio Rivera, Officer Middaugh told the arriving officers that he saw Ray toss something silver, and he asked the officers to look for the gun in a particular area. Officer Rivera discovered a 9 millimeter handgun positioned slightly underneath a deck attached to the back of the apartment building. Officer Middaugh identified the handgun as the one he saw Ray holding in his waistband. The gun had a small amount of mud splattered on it, but the gun was not buried in mud or covered in mud. The lot was muddy and covered in trash and debris, but no other handguns were found during the search. According to Officer Middaugh, the gun and the magazine were found within ten feet of each other. Officer McNeeley's police report, which was based on information provided by Officer Middaugh, stated that the handgun was found in the vicinity of Ray's hands when he fell. The gun was sent to a laboratory for analysis of

fingerprints and DNA, but the analysis ultimately was deemed to be unnecessary because Officer Middaugh could testify to having seen the gun in Ray's possession. *Id.* at 432, 436, 441, 444, 446–47, 460, 464–67, 470, 472.

Detective James Kooser, a firearms examiner, received the handgun and magazine at a forensics laboratory for the purpose of test-firing the weapon and entering a digital image of a fired cartridge case into the Nationally Integrated Ballistic Information Network (NIBIN) for future comparisons. Detective Kooser testified that the handgun had so much mud on it that he had to clean it before he could examine it and his examination revealed that the firearm would not fire normally because the sear spring had been removed intentionally. Detective Kooser knew that some criminals disable handguns after committing crimes because Ohio state law specifies lower penalties for the possession of inoperable firearms. Such a firearm still has value to a criminal, however, because it can be pointed at a person who would not know that the gun might not fire normally. Months after the conclusion of the initial examination, Detective Kooser and his assistant thought of a way to fire the gun without the sear spring by turning it upside down and working the slide to allow the sear to fall by gravity. Once that was done and a round loaded into the chamber, the gun could be turned right side up and fired. Using this method, they successfully fired two rounds through the gun. The magazine belonged to the gun and functioned with it, even though the magazine could not be secured in the gun. Detective Kooser test-fired the gun while holding the magazine in place. The gun was not safe to carry loaded because it could fire in fully automatic mode if it was bumped or dropped. ATF Special Agent Lance Mullen testified that the firearm receiver and slide were manufactured in California and sent to Jimenez Arms for assembly in Nevada. *Id.* at 478–84, 492, 494–96, 502–04, 509–10.

In addition to other exhibits, the government introduced into evidence two photographs of the apartment building and lot where the traffic stop and foot chase occurred. The district court excluded Ray's photographs of the same lot, which he attempted to introduce into evidence through the testimony of the defense investigator who took the photographs. The court observed that defense counsel did not show the photographs to the police witnesses to establish a foundation that they accurately depicted the scene and found that Ray's photographs—taken in a different season of the year and showing many fallen leaves on the ground but little trash and debris—did not appear to depict the scene accurately. Following this exclusion, defense counsel ended his brief examination of the defense investigator and did not call Ray or any other witnesses to testify. Ray stipulated that he had a qualifying prior felony conviction. R. 53 Page ID 429, 434, 514–15, 524–31.

## II. ANALYSIS

Ray presents four claims: (1) the district court erred in denying his motion to suppress the handgun and magazine; (2) the court denied him the right to present a defense when the court excluded the defense investigator's photographs and testimony about the photographs; (3) the government failed to prove the essential elements of the offense; and (4) the court should have granted his motion for judgment of acquittal or, in the alternative, for a new trial. We will consider each of these issues, beginning with the motion to suppress.

### A. Motion to Suppress Evidence

In reviewing the denial of a motion to suppress evidence, we examine the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012). A factual finding is clearly erroneous if this court, reviewing the evidence, reaches a definite and firm conviction that a mistake was committed. *United States v.*

*Gunter*, 551 F.3d 472, 479 (6th Cir. 2009). Because the district court denied Ray's motion to suppress, we review the evidence in the light most favorable to the government. *Id.*

To effectuate a traffic stop, a police officer must have "probable cause of a civil infraction or reasonable suspicion of criminal activity." *Lyons*, 687 F.3d at 763. Officer Middaugh's decision to conduct a traffic stop was constitutionally reasonable because he had probable cause to believe that Ray violated state and local law when he failed to obey the stop sign at the intersection of West 30th Street and Sackett. *See* Ohio Rev. Code Ann. § 4511.43; Cleveland Codified Ordinance § 431.19; *Whren v. United States*, 517 U.S. 806, 819 (1996). In reaching our conclusion, we defer to the district court's determination that the police officers were more credible witnesses than Ray and to the finding that Officer Middaugh did not activate the police car's lights and siren until Ray failed to make the required stop at the intersection. The court rejected Ray's contrary testimony that Officer Middaugh activated the police car's lights on West 25th Street when the police car made a u-turn and started following Ray. The court's credibility findings are virtually "unassailable," *United States v. Maliszewski*, 161 F.3d 992, 1020 (6th Cir. 1998), and its factual findings are not clearly erroneous. *See Lyons*, 687 F.3d at 763. Probable cause supported the traffic stop, and any subjective motivations the police may have harbored in making the stop are simply not relevant to the Fourth Amendment analysis. *See Whren*, 517 U.S. at 819; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc).

Although Ray pulled over to the curb on the wrong side of the street and stopped his car, a Fourth Amendment seizure did not occur because Ray did not submit to the police officers' show of authority. A suspect is seized "within the meaning of the Fourth Amendment where an officer applies physical force to restrain [the] suspect or 'a show of authority . . . has in some

way restrained the liberty of [the] citizen.'" *United States v. Jeter*, 721 F.3d 746, 751–52 (6th Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). If physical force or submission to the assertion of authority is absent, no seizure occurs. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). A seizure requires "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . [The Fourth Amendment] does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure," *id.*, and is, at most, an attempted one. *Brendlin v. California*, 551 U.S. 249, 254 (2007).

Our court and sister circuits have determined that there were no seizures for Fourth Amendment purposes in cases with facts similar to this one. In *Jeter*, 721 F.3d at 750–52, we held that a seizure did not occur where two police officers used their car to block the path of a bicyclist on a parking lot. Jeter stopped his bike, and one of the officers stepped out of the car and approached. *Id.* at 750. Jeter looked at both officers, dropped his bicycle, and ran away. *Id.* As the officers chased Jeter, they saw him clutching the right front pocket of his shorts. *Id.* The police quickly caught him, searched him, and recovered a .22 caliber handgun from the same pocket. *Id.* Like Ray, Jeter was convicted of being a felon in possession of a firearm. *Id.* We upheld the denial of Jeter's motion to suppress the firearm on the ground that no Fourth Amendment seizure occurred when the police blocked the path of Jeter's bicycle. *Id.* at 750–53. We explained that Jeter's "momentary pause" could "hardly be considered a submission to authority, especially where he did not attempt to converse with the officers. In fact, Jeter intentionally ignored the officers and their requests." *Id.* at 752–53. Because there was no seizure, we held there was no Fourth Amendment violation. *Id.* at 753; s*ee also United States v. Baldwin*, 496 F.3d 215, 218 (2d Cir. 2007) ("We hold that, to comply with an order to stop—and

thus to become seized—a suspect must do more than halt temporarily; he must submit to police authority, for 'there is no seizure without actual submission'"); *United States v. Valentine*, 232 F.3d 350, 352–53, 358–59 (3d Cir. 2000) (finding no Fourth Amendment seizure where uniformed officers in a marked police car stopped, stepped out of their vehicle, and ordered suspect to "come over and place his hands on the car," to which suspect responded, "Who, me?" and fled); *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994) (holding suspect's "momentary hesitation and direct eye contact" with police officer did not constitute submission to authority); *but see United States v. Morgan*, 936 F.2d 1561, 1567 (10th Cir. 1991) (holding suspect was seized under the Fourth Amendment where he momentarily yielded to a police officer's show of authority).

In this case, Ray did not yield to Officer Middaugh's show of authority. He stepped out of his car and momentarily turned to face Officer Middaugh, but he said nothing to the officer, took one step forward to avoid his car door, and immediately fled on foot through the adjacent lot. "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Unprovoked flight gives a police officer reasonable suspicion under *Terry* to give chase, stop the suspect, and conduct a protective patdown for weapons. *Id.* at 121, 124–26. Ray does not suggest that the police officers provoked his flight by placing him in "reasonable fear of physical harm." *See Jeter*, 721 F.3d at 754.

Because Ray was not seized until Officer Middaugh captured him on foot, Ray abandoned the handgun and magazine as he threw them away or they fell from his body during the chase. In *Hodari D.*, the Supreme Court denied suppression where a suspect was not seized until the police tackled him after a foot chase. 499 U.S. at 629. The cocaine thrown away by the

suspect while running was deemed abandoned and did not constitute the fruit of a Fourth Amendment seizure. *Id.*; *see also United States v. Martin*, 399 F.3d 750, 753 (6th Cir. 2005) (holding suspect abandoned the firearm that he discarded before he was seized during attempt to flee). Once Ray was seized, Officer Middaugh had authority to arrest him without a warrant for any traffic or firearm offenses committed in the officer's presence. *United States v. Watson*, 423 U.S. 411, 418 (1976); *United States v. Smith*, 73 F.3d 1414, 1416 (6th Cir. 1996); *State v. Henderson*, 554 N.E.2d 104, 106 (Ohio 1990). In sum, Officer Middaugh acted within the law when he stopped Ray's car, chased Ray on foot, captured him, patted him down for weapons, and arrested him on various traffic and weapons offenses.

Ray insists that the police officers unlawfully followed him from West 25th Street because his car did not have side mirrors. He contends that state and municipal law required that his vehicle have only a rearview mirror, Ohio Rev. Code Ann. § 4513.23; Cleveland Codified Ordinance § 437.21, and therefore, the police officers lacked reasonable suspicion to track his car. *See United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012) (noting a court must initially determine whether a *Terry* stop was "'justified at its inception.'"). If Officer Middaugh unlawfully targeted him, Ray argues, the subsequent traffic stop on West 30th Street was tainted by the initial illegality.

Ray's argument fails because the district court believed the officers' testimony, not his. The police did not observe *any* mirrors on Ray's car. Because the apparent lack of a rearview mirror suggested a potential violation of law, the officers had reasonable suspicion to investigate. *See Lyons*, 687 F.3d at 763. No Fourth Amendment violation occurred simply because Officer Middaugh drove behind Ray's car without activating his lights or siren.

For all of these reasons, the district court properly denied Ray's motion to suppress evidence.

## B. Exclusion of photographs

We next consider Ray's argument that the district court should have admitted into evidence at trial certain defense photographs depicting the lot where the foot chase occurred and testimony of the defense investigator concerning the photographs. The government objected to admission of this evidence on multiple grounds: relevance; the probative value of the evidence was substantially outweighed by the danger of unfair prejudice; and the potential for the evidence to confuse the issues or mislead the jury. Fed. R. Evid. 401, 403.

We review for abuse of discretion a district court's decision to exclude evidence. *United States v. Stepp*, 680 F.3d 651, 660 (6th Cir. 2012). Generally, we will not disturb a court's evidentiary ruling unless we reach a definite and firm conviction that the court made a clear error of judgment in weighing the relevant factors or that the court improperly applied the law. *Id.*

The district court compared Ray's photographs to those already admitted into evidence and "identified as representative of the scene" due to the amount of trash and debris depicted on the lot. The court expressed concern that Ray's photographs were taken in a different season of the year, showed fallen leaves about which no witness had testified, depicted less trash and debris on the lot, and overall depicted "a significantly different setting" and "different conditions" than were shown in the government's exhibits. Because defense counsel did not present the photographs to any witness who could authenticate them as accurate representations of the scene of Ray's arrest, the court excluded the photographs and testimony due to the strong potential of the evidence to mislead or confuse the jury. R. 53 Page ID 526–31.

The Constitution allows a trial judge to exclude defense evidence under established court rules where the evidence is marginally relevant or poses an undue risk of prejudice or confusion of the issues. *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006). The court's exclusion of Ray's proffered exhibits and testimony fell well within Rules of Evidence 401 and 403 and did not deprive him of the right to present a defense. Accordingly, we affirm the court's evidentiary ruling.

Ray argues for the first time on appeal that the district court should not have admitted into evidence the government's photographs, Exhibits 4 and 5. We will not address this argument because Ray waived it when his counsel expressly stated on the trial record that he had no objection to admission of the government's exhibits. R. 53 Page ID 514. *See United States v. Olano*, 507 U.S. 725, 733 (1993) (explaining that waiver is the intentional relinquishment or abandonment of a known right and is different from forfeiture).

## C. Sufficiency of the evidence and post-trial motions

Finally, we consider Ray's remaining arguments together. He contends the government's evidence was insufficient to prove beyond a reasonable doubt that he possessed the handgun and magazine and consequently, the district court should have granted his motions for judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial under Federal Rule of Criminal Procedure 33.

Ray preserved this issue by moving for judgment of acquittal at the close of the government's case in chief, again at the close of the defense case, and again in a post-trial motion in which he also moved for a new trial. R. 53 Page ID 518, 539; R. 57. We review de novo his challenge to the sufficiency of the evidence, and taking the evidence in the light most favorable to the government, we consider whether "*any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt." *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal quotation marks omitted)). Under Rule 29, we do not reweigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury. *Id.*

A rational trier of fact could find that Ray possessed the handgun and magazine found on the empty lot following the foot chase. Officer Middaugh saw Ray holding the handgun in his waistband at the moment he turned around at his car door. When the chase was over, Officer Middaugh identified the handgun found on the lot as the one he saw Ray holding in his waistband. The jury was told that the firearm was covered in mud and did not operate normally. It was found ten feet from the magazine, which would not seat securely in the gun. Ray's counsel argued to the jury that the handgun and magazine were nothing but trash left on the lot long before Ray ran across it.

It was the jury's province to hear all of the evidence, judge the credibility of the witnesses, and resolve the factual disputes. The jury chose to convict. Evaluating the evidence in the light most favorable to the government, we are convinced that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Fisher*, 648 F.3d at 450.

We are also persuaded that the jury's verdict was not against the manifest weight of the evidence. *See United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007). A new trial may be granted under Rule 33 if the extraordinary circumstance arises that the evidence preponderates heavily against the verdict. *Id.* at 593. The district judge may weigh the evidence and assess the credibility of witnesses in the role of a thirteenth juror. *Id.* Our appellate review is limited, however, to deciding whether the district court clearly and manifestly abused its

discretion.  *Id.*  Having carefully examined the trial record and considered the district court's

opinion, R. 63, we find no clear and manifest abuse of discretion in the denial of Ray's Rule 33

motion.

## III.  CONCLUSION

We AFFIRM the judgment of the district court.