RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

MAURICE DUNCAN BURKS,

*Defendant-Appellee*.

No. 19-6010

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:17-cr-00124-2—Waverly D. Crenshaw, Jr., District Judge.

Argued: July 30, 2020

Decided and Filed: September 4, 2020

Before: BOGGS, SUTTON, and WHITE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Cecil W. VanDevender, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellant. John Bailey, Brentwood, Tennessee, for Appellee. **ON BRIEF:** Cecil W. VanDevender, Ben Schrader, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellant. John Bailey, Brentwood, Tennessee, for Appellee.

SUTTON, J., delivered the opinion of the court in which BOGGS, J., joined. WHITE, J. (pp. 9–23), delivered a separate dissenting opinion.

───────────────

## OPINION

───────────────

SUTTON, Circuit Judge. A jury convicted Maurice Burks for murdering Malcolm Wright. Burks moved for an acquittal and a new trial, pointing to inconsistencies in witness

testimony and a lack of physical evidence. The district court denied Burks's motion for an acquittal but ordered a new trial on the murder charges. The government appeals, and we reverse.

In March 2019, the federal government brought racketeering, drug distribution, and murder charges against eleven members of the Gangster Disciples. Although the gang operates throughout the United States, this prosecution concerns the activities of one "deck," a group based in Clarksville, Tennessee. And although the wider case involves many charges, this appeal concerns just one: Maurice Burks's conviction for murdering Malcolm Wright.

Life as a Gangster Disciple requires commitments all their own. Disciples must pay dues, attend meetings, and study a set of "literature" including "The I Pledge, the We Pledge, the Creed, the 17 Laws, the organizational structure, and the six-point stance." R. 1472 at 90. They must serve in leadership posts, such as "Governor," "Regent," "Literature Coordinator," "Secretary," "Treasurer," "Enforcer," and "Chief of Security." And they must adhere to certain "concepts." For a time, members observed the "360 concept," which outlined a "gangbanger lifestyle." *Id.* at 76. More recently, the Gangster Disciples upgraded to the "720 concept," which aims to transform the group into "more of an organization." *Id.* Under both concepts, members must deal drugs, carry guns, and assault and kill rival gang members. "[O]pposition" gangs include the "Crips, Bloods, [and] Vice Lords." *Id.* at 15.

Maurice Burks, known as "Mac Reese" to other Disciples, was a committed member by all accounts. For several years, he served the Clarksville deck as a "Regent" and an "Enforcer." That gave him leadership responsibility and the duty to "make[] sure everything's enforced." R. 1472 at 80.

According to the government, Burks did just that on November 3, 2012. That evening, most of the Clarksville deck agreed to provide security for a Gangster Disciple-turned-rapper named "Lil Scrappy." But one member, Brandon Hardison, decided to go to a club called Sidelines instead. At the club, a group of Bloods attacked him. The club security tossed the group outside, and Hardison immediately called Burks, alerting him and other Gangster Disciples of the assault. A little while later, several Disciples met at another club called C-

Ray's. Together, the Disciples searched for a Blood in C-Ray's to seek revenge for Hardison's assault.

The parties agree on a few points about what happened next. Several Gangster Disciples entered C-Ray's and discovered Malcolm Wright, a Blood who had helped attack Hardison, partying without his crew. Wright and his girlfriend, Kristine Gaskin, went to C-Ray's on their own after the Sidelines attack. Outnumbered, Wright tried to smooth things over with the Disciples. The group attacked Wright anyway. During the melee, someone shot Wright in the leg. He staggered toward the club's front door and collapsed. Someone fired a second shot into Wright's abdomen. Gaskin, hiding elsewhere, helped Wright leave the club. The pair managed to reach a ramp before Wright collapsed and died.

The disagreement centers on who shot Wright. The government claims it was Burks. At trial, prosecutors presented three informants to tie Burks to the killing. One testified that Burks later confessed to the murder. Another told a grand jury that Burks confessed to killing Wright but refused to repeat the testimony on the stand during the trial. And a third said that Burks confessed to killing someone without naming Wright as the victim. Based on that evidence, the jury convicted Burks on all charges arising from Wright's death.

Burks moved for an acquittal and new trial. The district court denied Burks an acquittal but granted him a new trial on four counts, deeming the verdict for those counts "against the manifest weight of the evidence." R. 1460 at 49. The government appealed. Some months later, the government realized it had not disclosed two investigation reports related to Burks's case. Burks moved for a new trial on two counts not subject to the new trial order, claiming the government had violated *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied the motion, and it is not the subject of this appeal.

II.

Criminal Rule 33 permits a district court "to vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). This language authorizes a district court to order a new trial if the evidence weighs "heavily against the verdict." *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019). Before making its decision, the court must consider

competing principles. On the one hand, it must scrutinize the record and ensure that a "miscarriage of justice" did not occur. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). On the other hand, the court must respect the role of the jury and ensure that evidence-supported convictions are upheld. *Id.* Only in "extraordinary circumstances," *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007), when the verdict exceeds the bounds of reasonableness, should the district court order a new trial. "The verdict [is not] unreasonable simply because different inferences could have been drawn or because other results are more reasonable." *United States v. Lyimo*, 574 F. App'x 667, 672 (6th Cir. 2014) (quoting *Porter v. Lima Mem'l Hosp.*, 995 F.2d 629, 635 (6th Cir. 1993)); *see also Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004) ("[T]he court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." (quotation omitted)). Mindful of the trial court's ring-side view of the evidence, we review the trial court's decision for abuse of discretion. *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988).

The court abused its discretion. It discounted one informant's grand jury testimony without a valid reason. And it discredited the other informants' trial testimony based on contested facts that we generally task juries with resolving. The evidence produced in this case did not weigh heavily against the verdict. It set out a straightforward narrative that the jury could reasonably believe.

Start with the grand jury testimony introduced at trial. After Ronnie Daniels, a friend of several Disciples, refused to testify, the government introduced his grand jury statements. In that testimony, Daniels admitted that he met several Disciples at C-Ray's, including Burks, on the night of the shooting. Outside the club, the group decided to "execute" someone inside the club. R. 1321 at 47. Daniels observed the group, which included Burks, go inside the club, and a few minutes later, a stream of people came running out. A Disciple, "Trap," returned to the car and told Daniels to wait for Burks. A "half a minute later," Burks exited the club. *Id.* at 57. A few weeks after that, Daniels overheard Burks tell Trap to leave him alone or he would "do you like I did that N-word at C-Ray's." *Id.* at 60.

The district court discounted this testimony on the ground that the "jury in this case had no way to assess Daniels' credibility." R. 1460 at 48. It's true that whenever out-of-court

statements are admitted as evidence at trial, the jury has no way to assess credibility in the sense of being able to observe the declarant's demeanor at the time the out-of-court statement is made. But in this particular case, the district court's perspective overlooks two realities. One: Grand jury statements may be admitted as substantive evidence of a crime. *United States v. LaVictor*, 848 F.3d 428, 451 (6th Cir. 2017). It's for the jury to decide how much weight to give this evidence, and it's for the jury to decide whether Daniels's refusal to repeat the testimony in open court casts doubt on its veracity. Two: Daniels's credibility at trial, not before the grand jury, is what matters. The jury had what it needed to make an assessment too. *California v. Green*, 399 U.S. 149, 160–61 (1970); *United States v. DiCaro*, 772 F.2d 1314, 1325 (7th Cir. 1985). It could judge for itself what to make of Daniels's testimony that he could not remember his grand jury statements. Maybe Daniels testified falsely at the grand jury. Or maybe he lost his nerve when it came time to blame a fellow gang member for the murder in open court. It's hard to see what judges know, and jurors do not, when it comes to deciding whether to credit this grand jury testimony. But what matters is that the jury had the opportunity to observe Daniels's demeanor when he denied any recollection of events and refused even to agree that he had made statements recorded in his testimony.

The same is true of the district court's assessment of the government's other informants. It saw inconsistencies in their testimony that the record does not bear out or that juries are expected to resolve. Take Danyon Dowlen's story. A fellow Disciple, he said Burks told him the following: "[Wright] a bad mother-F. He made it out there. I hit him in his head once and he was still crawling. And he—I hit him again, and he still made it out there." R. 1474 at 184. The district court saw three main issues with this account. One: Wright's girlfriend, Kristine Gaskin, said a "medium height" man shot Wright, but Burks is 6'4". R. 1460 at 45. Two: The shooter hit Wright in C-Ray's "front entryway," not outside the club. *Id.* Three: The shooter hit Wright in the leg and in the abdomen, not the head. *Id.*

But Gaskin did not see a "medium" height person shoot Wright. She saw a medium height person *standing over* Wright after someone fired the second shot. Dowlen did not claim that Burks shot Wright outside C-Ray's. He related Burks's surprise that Wright had *made it outside* C-Ray's despite being shot twice. Although the shooter did not shoot Wright in the head,

he did shoot him twice, and it's possible he either could not see where the first shot landed or he embellished the target with a detail that would make him appear ruthless or skillful. In the Disciples' world, as the jury heard, toughness and firearms proficiency generate cachet.

Dezorick "Lord Slick" Ford's testimony deserves more credit too. He claims that in prison he told Burks he had received significant time "[f]or a bad mother[----]." R. 1475 at 88. Burks replied that he hoped "they" would not get him on a "bad mother[----]." *Id.* According to Ford, "bad mother[----]" is slang for a murder charge. The court found this exchange implausible because Ford belongs to the Vice Lords, a rival gang, and no one else used "bad mother[----]" at trial to describe a murder. But the record belies these concerns. Though the Vice Lords and Disciples fought, members still associated with each other. Ford in particular had good reason to go outside his usual circle. His brother belonged to the Disciples and knew Burks. As for the phrase "bad mother[----]," there are plenty of gang-related terms with non-obvious meanings. The jury heard that the gangs used surprising terms for a variety of illegal activity. "Pepperonis" meant "8-balls," "Salad" meant "Money," and "Deuce" meant "Meeting."

All told, three witnesses shared one story: Burks shot Wright. Did Burks's defense offer reasons to discount their testimony? No doubt. Did believing this story require the jury to draw inferences or disregard conflicting testimony? No doubt. But all of this explains the need for a trial and the need for a jury to make reasonable credibility and judgment calls.

The case law does not permit district courts to grant new trials based on unexplained and unjustified credibility assessments of the witnesses, at least when all of them, three in this instance, told a consistent narrative that the jury could reasonably believe and when the court could not offer an explanation for discounting this consistent testimony other than a reality in many criminal cases: Some of the testimony occurred before a grand jury and some of it could give a witness cooperation benefits at his own sentencing hearings. Burks does not offer a single citation for such a proposition and indeed he does not cite a single case in which our court upheld the grant of a new trial in a criminal case. We know of one unpublished case in which our court affirmed the grant of a new trial based on the weight of the evidence. *See United States v. Lewis*, 521 F. App'x 530, 541 (6th Cir. 2013). But even that decision did not turn on unexplained credibility assessments. It turned on "numerous discrepancies" in a key witness's testimony and

"the lack of corroborating testimony or evidence." *Id.* at 535. Our own research shows that virtually every one of our cases dealing with the weight of the evidence involves affirmances of district court denials of new trial motions. *See, e.g.*, *Bowens*, 938 F.3d at 796; *United States v. Wiggins*, 784 F. App'x 919, 926–27 (6th Cir. 2019); *United States v. Braswell*, 704 F. App'x 528, 540 (6th Cir. 2017); *United States v. Darji*, 609 F. App'x 320, 339 (6th Cir. 2015); *United States v. Freeman-Payne*, 626 F. App'x 579, 585 (6th Cir. 2015); *United States v. Poandl*, 612 F. App'x 356, 362–63 (6th Cir. 2015); *United States v. Six*, 600 F. App'x 346, 355–56 (6th Cir. 2015); *United States v. Ray*, 597 F. App'x 832, 840 (6th Cir. 2015); *Lyimo*, 574 F. App'x at 672; *United States v. Funzie*, 543 F. App'x 545, 549 (6th Cir. 2013); *United States v. Perales*, 534 F. App'x 502, 506 (6th Cir. 2013); *United States v. Smith*, 601 F.3d 530, 543–44 (6th Cir. 2010); *United States v. Roland*, 233 F. App'x 476, 483–84 (6th Cir. 2007); *Hughes*, 505 F.3d at 594; *United States v. Crumb*, 187 F. App'x 532, 536–37 (6th Cir. 2006); *United States v. Graham*, 125 F. App'x 624, 633 (6th Cir. 2005); *United States v. Robinson*, 99 F. App'x 655, 658 (6th Cir. 2004); *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003); *United States v. Allgood*, 45 F. App'x 407, 412 (6th Cir. 2002); *United States v. Turner*, 22 F. App'x 404, 411 (6th Cir. 2001); *United States v. Alsop*, 12 F. App'x 253, 261–62 (6th Cir. 2001); *United States v. Bentz*, 234 F.3d 1270 (6th Cir. 2000) (Table); *Lutz*, 154 F.3d at 589; *United States v. Pierce*, 62 F.3d 818, 826 (6th Cir. 1995); *United States v. Hardin*, 9 F.3d 1548 (6th Cir. 1993) (Table); *Ashworth*, 836 F.2d at 266.

A contrary approach would conflict with how Rule 33 works. It's only when "exceptional circumstances" arise that a trial judge "may intrude upon the jury function of credibility assessment." *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008) (Sotomayor, J.) (quotation omitted); *see Lutz*, 154 F.3d at 589. When it comes to testimony, that means trials featuring accounts that "def[y] physical realities," *Cote*, 544 F.3d at 102, or collapse in on themselves due to "internal inconsistencies," *Lewis*, 521 F. App'x at 541; *see United States v. Rivera Rangel*, 396 F.3d 476, 486 (1st Cir. 2005). It doesn't mean trials like Burks's, where three people all told a consistent and plausible story—Burks murdered Wright—and no one offered a consistent competing account of another assailant.

What about the reality that Dowlen and Ford testified in exchange for help on their own charges?  Many cases turn on testimony "produced by the falling out, jealousies, and quarrels of those who live by outwitting the law." *On Lee v. United States*, 343 U.S. 747, 756 (1952); *see United States v. Bailey*, 510 F.3d 726, 734 (7th Cir. 2007).  Sometimes it's also necessary to procure that evidence with a shorter prison sentence. *Bailey*, 510 F.3d at 734.  Juries learn this in many trials, and Burks was free to argue it, and he did so, here.  Juries have the wherewithal to "suspect" informers' "motives from the moment they hear about them in a case." *Robinson v. Mills*, 592 F.3d 730, 737 (6th Cir. 2010).  And they can choose to believe informants' stories or not based on the evidence and life experiences they use to resolve all credibility questions.  That Burks's jury chose to believe the consistent testimony of these three witnesses instead of other witnesses or his defense counsel does not supply a basis for granting a new trial.

Maybe so, Burks responds, but what about the reality that Dowlen identified Brandon Hardison, a different Gangster Disciple (and the victim of the first attack), as Wright's shooter when investigators first asked about the murder?  Same answer.  Burks's counsel cross-examined Dowlen on the point.  The jury heard his response and decided whether he (and the other witnesses) told the truth.

We reverse.

---

**DISSENT**

---

HELENE N. WHITE, Circuit Judge, dissenting.  I respectfully dissent.  The majority employs an inappropriate standard of review, incompletely considers the record, and rejects the district court's credibility and factual determinations in favor of its own.  Because the district court did not abuse its discretion in weighing the evidence and assessing the witnesses' credibility, I would affirm.

## I.  Analysis

Under Fed. R. Crim. P. 33, "[a] reversal based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).  "When such a motion is granted, . . . the decision will not be disturbed unless the district court clearly abused its discretion." *United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000).

The majority concludes that "[t]he evidence produced in this case did not weigh heavily against the verdict."  Maj. Op. at 4.  However, this court lacks authority to reweigh the evidence. *United States v. Dimora*, 750 F.3d 619, 628 (6th Cir. 2014).  It is true that "[a] trial court should only grant the motion when the verdict is against the 'manifest weight' of the evidence." *United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019) (quoting *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018)).  But once the district court determines that the verdict is against the manifest weight of the evidence, our role is limited to determining if the district court's order was "a clear and manifest abuse of discretion, [or] instead was supported by the evidence." *United States v. Pierce*, 62 F.3d 818, 826 (6th Cir. 1995).  "A district court abuses its discretion 'when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law.'" *United States v. Arny*, 831 F.3d 725, 730 (6th Cir. 2016) (quoting *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014)).

"When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *Lutz*, 154 F.3d at 589.  "Yet appellate court judges, who have only a transcript to work with, have no such authority." *Dimora*, 750 F.3d at 628.  This court's role "is not to sit as a 'thirteenth juror' and re-weigh the evidence, but to examine the evidence to determine whether the district court's ruling . . . was 'a clear and manifest abuse of discretion.'" *Lutz*, 154 F.3d at 589 (quoting *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)).  This "narrow standard of review" aligns with the "rationale underlying Fed. R. Crim. P. 33 that 'the trial judge, not an appellate court reading a cold record, can best weigh the errors against the record as a whole.'" *United States v. Breinig*, 70 F.3d 850, 852 (6th Cir. 1995) (quoting *United States v. McBride*, 862 F.2d 1316, 1320 (8th Cir. 1988)).

We must "look[] to the entire record to determine whether the district court abused its discretion." *Pierce*, 62 F.3d at 826.  "[I]f the district court simply 'disagree[d] with the jury's resolution of conflicting evidence,' we might not find an abuse of discretion.  Instead, we . . . have to examine the record to determine whether the district court relied on clearly erroneous factual findings." *United States v. Paulus*, 894 F.3d 267, 279 (6th Cir. 2018) (citation omitted) (second alteration in original) (quoting *Lutz*, 154 F.3d at 589).

Although the majority engages in its own reweighing of the evidence and disagrees with how the district court assessed the credibility of the witnesses, the majority  fails to explain how the district court's factual and credibility determinations are clearly erroneous or how the district court abused its discretion.  The district court appropriately acted as a thirteenth juror and its conclusions are fully supported by the record.  The majority, on the other hand, inappropriately enters "the forbidden territory of re-weighing the evidence." *Dimora*, 750 F.3d at 627.  Even under the majority's flawed standard of review, however, it insufficiently engages with the district court's order and the record.

## A.  Ronnie Daniels

The majority asserts that Daniels "told a grand jury that Burks confessed to killing Wright but refused to repeat the testimony on the stand during the trial." Maj. Op. at 3.  Ignoring the district court's credibility determination and assuming that Daniels told the truth, it is a leap to conclude that Burks *confessed to a murder* in his exchange with Daniels.  According to Daniels's grand jury testimony, Burks stated, "I'm gonna do you like I did that N-word at C-Ray's."  R. 1321, PID 10223.  If Burks did make this statement, given that Gaskin testified that a group of Gangster Disciples (GDs) jumped Wright, "swinging on him and kicking him," Burks could have been referring to a beating rather than a murder.  R. 1483, PID 12803.  Or, given that Daniels did not testify that Burks mentioned Wright, the history of violence between the GDs and Bloods, and the Bloods' close association with C-Ray's, Burks could have been referring to an altogether separate incident not involving Wright.  This is not to say that this court may reweigh the evidence and determine that one conclusion is correct, but only that the record supports the district court's decision to discount Daniels's testimony and Burks's purported "confession."

Further, the majority's dismissal of the district court's credibility determination in favor of its own inferences is unmoored from the record.  Daniels did not simply testify "that he could not remember his grand jury statements." Maj. Op. at 5.  Daniels repeatedly testified that he previously cooperated with the government because he "was nervous and [he] was scared," and he "was saying whatever [he] had to say to go home."  R. 1412, PID 10966, 10976.  And Daniels testified that just because he said something before the grand jury, "it does not make it true." *Id.* at 10969-70.  These statements, combined with the district court's ability to observe the witness, provide ample support for the conclusion that Daniels lacked credibility at trial, before the grand jury, or both.  Therefore, the district court did not abuse its discretion in discounting Daniels's testimony.[1]

---

[1]And the majority ignores altogether that the government brought charges against Daniels for perjury based on his testimony: "On August 14, 2019, the government indicted one of the witnesses who testified at trial in this case (Ronald Marion Daniels, II) on two counts of perjury, in connection with his trial testimony and in violation of 18 U.S.C. § 1623." R. 1622, PID 14702.

The majority also asserts that "[t]he jury had what it needed to make an assessment" and that "[i]t's for the jury to decide how much weight to give this evidence, and it's for the jury to decide whether Daniels' refusal to repeat the testimony in open court casts doubt on its veracity." Maj. Op. at 5. But on a Rule 33 motion, our caselaw establishes that the district court "may appropriately 'act as a thirteenth juror, assessing the credibility of the witnesses and the weight of the evidence.'" *Dimora*, 750 F.3d at 627-28 (quoting *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)). The majority fails to explain how the district court abused its discretion in fulfilling its proper role under our caselaw. And by asserting that "[i]t's hard to see what judges know, and jurors do not, when it comes to deciding whether to credit this grand jury testimony," Maj. Op. at 5, the majority leaves little room for the operation of Rule 33, which allows the district court to assess credibility, weigh the evidence, and "vacate any judgment and grant a new trial if the interest of justice so requires," Fed. R. Crim. P. 33.

**B. Danyon Dowlen**

In discussing the testimony of Danyon Dowlen, the majority misinterprets both the district court's reasoning and the record. First, the district court concluded that the shooter "was described by Gaskin as being of 'medium height.'" R. 1460, PID 11820. The majority reweighs the evidence and disagrees, concluding that "Gaskin did not see a 'medium' height person shoot Wright. She saw a medium height person *standing over* Wright after someone fired the second shot." Maj. Op. at 5. Gaskin testified:

A.   By the time he fell and I heard the gunshot, though, nobody else was running out.

Q.   You said you heard a second gunshot?

A.   Correct.

Q.   Where was Malcom when you saw -- when you heard the second gunshot?

A.   Lying in the doorway.

Q.   In the front door -- in the front entrance?

A.   Yes.

Q.   Okay. Did you observe who shot him?

A.   I did not.

Q. Where was the gunshot coming from? From the outside? From the inside? Do you have any recollection?

A. From the inside.

Q. . . . And when you heard that gunshot, were there other people in that area?

A. There -- there -- no. When I heard the gunshot, yes, there were other people in the area. It was someone -- someone appeared to be standing over him.

Q. Can you explain that?

A. I -- it just -- everything was going so fast, but it appeared like somebody had stopped right there, and then I heard the gunshot.

Q. Was it only one person and Malcom at the entrance to the club?

A. At that time.

Q. Okay. Do you remember what this person looked like?

A. No.

Q. Okay. Male or female?

A. Male.

Q. Tall or short?

A. Medium.

Q. Okay. Do you remember any type of hair?

A. No.

Q. African-American, Caucasian?

A. African-American.

Q. Okay. And then this – when you heard that gunshot and that person standing there, was anybody else in that – that room?

A. No.

Q. So it was just the three of you?

A. Yes.

Q. Just you crouched down, Malcom at the entrance to the door and another person?

A. Yes.

Q. And you heard a gunshot at that time?

A. Yes.

R. 1483, PID 12808-10.  It is true that Gaskin stated that she did not observe who the shooter was.  But she also testified that the shot came from inside the bar and that the only persons present in the room were herself, Wright, and the medium-height man standing over him.  The man "stopped right there, and then [Gaskin] heard the gunshot." *Id.* at 12809.  The district court properly reviewed this testimony, weighed the evidence, and reached a reasonable conclusion. The district court's determination that Gaskin described the shooter as being of medium height was not clearly erroneous and was not an abuse of discretion.

Second, according to the majority's misreading, the district court took issue with Dowlen's testimony because "[t]he shooter hit Wright in C-Ray's 'front entryway,' not outside the club." Maj. Op. at 5.  The majority then asserts that the district court erred because "Dowlen did not claim that Burks shot Wright outside C-Ray's.  He related Burks's surprise that Wright had *made it outside* C-Ray's despite being shot twice." *Id.*  But the district court nowhere stated that Dowlen claimed that Burks shot Wright outside C-Ray's.  Rather, the district court noted an obvious inconsistency between the testimonies of Gaskin and Dowlen:

> The Government also argues that Burks' purported confession that Wright was shot in the head at the back door is not inconsistent with the evidence because Burks did not say Wright *exited* via the back door.  All he really said was that "Wright managed to get to the back door of the club, seemingly after Burks had shot him in the head."  Problem is, this scenario is in direct conflict with Gaskin's testimony that, after Wright was shot the first time, he crawled towards the front of C-Ray's and was then shot in the *front* entryway by the same shooter.

R. 1460, PID 11820 (citation omitted).  Dowlen's story, in which Burks stated that Wright "was still crawling" and "made it to the back door," R. 1474, PID 12436, is undeniably in conflict with Gaskin's story, in which she saw Wright stumble toward "[t]he front door" and "[t]he entrance to the club" after the first gunshot, R. 1483, PID 12806-07.  After acknowledging the conflicting testimony, the district court properly exercised its discretion as the thirteenth juror and credited Gaskin's version over Dowlen's: "In a war of credibility between Gaskin and Dowlen, Gaskin wins hands down.  She certainly wanted to see justice for Malcolm's killer, but she also had no need to curry favor from the government." R. 1460, PID 11820.  The district court's credibility determination is fully supported by the record.

Third, the district court explained that "Dowlen testified Burks said that he shot Wright in the head, but Dr. David Zimmerman of the Davidson County Medical Examiner's Office testified that Wright was shot in the abdomen and the leg, and that Wright did not sustain a head injury."[2] R. 1460, PID 11819. Entering "the forbidden territory of re-weighing the evidence," *Dimora*, 750 F.3d at 627, the majority responds that "it's possible he either could not see where the first shot landed or he embellished the target with a detail that would make him appear ruthless or skillful," Maj. Op. at 6. But, properly weighing the evidence in its role as the thirteenth juror, the district court considered this possibility: "[T]he exact same argument could be made if Burks did *not* shoot Wright at all—he could simply claim to have shot him in the head to gain stature and increase his reputation." R. 1460, PID 11820. The majority rejects the district court's assessment of the evidence in favor of its own. But "appellate court judges, who have only a transcript to work with, have no such authority." *Dimora*, 750 F.3d at 628.

Finally, the district court's most critical observation is that Dowlen originally told the government that Hardison, not Burks, killed Wright:

> Nor does Dowlen's trial testimony square with what he had told authorities in the past. In a statement to agents, Dowlen said that Hardison probably killed Wright. Later, Dowlen changed course and pinned the blame on Burks. The Government explains this discrepancy as resulting from "Dowlen's mere prior speculation"

---

**[2]**Similar to Daniels, Dowlen did not describe a straight-forward confession:

A. Mr. Burks proceeded to say, "He made it to the back door. He -- he a bad" -- excuse my language – "he a bad mother------. I hit him in his head once and he was still crawling. So I hit him again. Good thing I had it in me."

Q. Did you understand what he was talking about?

A. Yes, that he had shot Mr. Gotti in the head.

R. 1474, PID 12436. Dowlen was later asked what he thought Burks meant by "hit":

Q. When he said, "I hit him in the head" --

A. Shot him.

Q. – you're not talking about a punch to the head?

A. No.

Q. All right. So my question was, you're telling us Mr. Burks told you that he shot Malcolm Wright, correct?

A. Yes. That's what I took it as.

*Id.* at 12520. The possibility that Burks described a punch to the head rather than a gunshot to the head further supports the district court's weighing of the evidence.

being "later debunked." (Doc. No. 1443 at 36). Elsewhere, the Government asserts that Dowlen "was surprised by [Burk's] admission to Wright's murder because, until that point, Dowlen had assumed that Hardison had killed Wright." (*Id.* at 27). Maybe so, but the "surprise" revelation from Burks allegedly occurred . . . in December 2012 or January 2013. The Government provides no explanation as to why Dowlen held on to his (now debunked) assumption for more than a year when he told agents in January 2014 that Hardison "probably" killed Wright. Nor does the Government offer a plausible explanation for why Dowlen waited yet another year thereafter to reveal Burks's supposed confession.

R. 1460, PID 11820-21. The majority responds that "Burks's counsel cross-examined Dowlen on the point. The jury heard his response and decided whether he (and the other witnesses) told the truth." Maj. Op. at 8. But the fact that the jury heard about this issue is irrelevant to the question before us. If the district court "disagree[d] with the jury's resolution of conflicting evidence," we must "examine the record to determine whether the district court relied on clearly erroneous factual findings." *Paulus*, 894 F.3d at 279 (alteration in original) (quoting *Lutz*, 154 F.3d at 589). The inconsistency and timing of Dowlen's statements support the district court's determination that he was not a credible witness and its conclusion that the conviction was against the manifest weight of the evidence. Therefore, the district court did not rely on clearly erroneous factual findings and it did not abuse its discretion.[3]

## C. Dezorick Ford

Again entering "the forbidden territory of re-weighing the evidence," *Dimora*, 750 F.3d at 627, the majority rejects the district court's assessment of Ford's credibility in favor of its own conclusion that "Ford's testimony deserves more credit," Maj. Op. at 6. Like its discussion of Daniels and Dowlen, the majority's analysis is flawed because "[w]e do not second-guess the district court's credibility determinations," but review only for abuse of discretion. *United States v. Lewis*, 521 F. App'x 530, 531 (6th Cir. 2013).

---

[3]Further, Dowlen's original statement that Hardison killed Wright belies the majority's assertion that no one offered a competing account of another assailant.

Ford testified that after he was sentenced on an unrelated case, he ran into Burks at Grayson County Jail:

> A.    I walked up.  I said, "What's up bruh?"
>
> He was like -- first thing he asked me about was my brother.  I told him I just got sentenced.  And I explained to him, my brother got severed away from the case.
>
> And he was like, "Yeah?"
>
> And I was explaining to him what happened and how much time I got, and how I got eight years, nine months, 105 months.  He was, "Like, damn. For a bad mother------?"
>
> I said, "Yeah."
>
> He said, "Damn. I hope they don't come get me on a bad mother------."
>
> Q.    What do you understand the term of "bad mother------" to mean?
>
> A.    On a murder case.

R. 1475, PID 12701.  The district court noted that over the course of trial, it "learned that use of the word 'motherf*****' is not uncommon.  However, the first time and only time the Court recalls 'bad motherf***' being used as a synonym for murder was during Ford's testimony." R. 1460, PID 11822.  The majority responds that it is fair to infer that the term did refer to a murder charge because "there are plenty of gang-related terms with non-obvious meanings." Maj. Op. at 6.  But the majority's own interpretation of the evidence is irrelevant, what matters is whether "[t]he trial record . . . supports the district court's conclusions."  *United States v. Hendricks*, 950 F.3d 348, 355 (6th Cir. 2020).  The "district court judge, who had a ring-side seat at the trial," reached a reasonable conclusion supported by the record.  *Dimora*, 750 F.3d at 627.

The district court also discredited Ford's testimony because "(1) Ford is a member of the Vice Lords, (2) the Gangster Disciples and Vice Lords are archenemies who compete for territory, (3) Ford is the one who sucker-punched Hardison at Sidelines."  R. 1460, PID 11822. Again, the majority abandons the proper standard of review, reweighs the evidence and the credibility of the witness, and reaches its own conclusion based on an incomplete review of the record: "Though the Vice Lords and Disciples fought, members still associated with each other. Ford in particular had good reason to go outside his usual circle.  His brother belonged to the Disciples and knew Burks." Maj. Op. at 6.

It is true that Ford's brother was a GD.  Ford, however, testified that he has a "strained" relationship with that brother: "I always had kind of a sibling rivalry with him. . . .  He -- maybe he carried hisself like he was better than me since we was little kids.  So I always kind of went against whatever he was doing."  R. 1475, PID 12621, 12624.  It is also true that GDs and Vice Lords in Clarksville sometimes associated for business purposes.  However, Ford testified that although he had a relationship with some GDs from growing up with them, "that's a different situation than the ones that I don't know that well or didn't know me that well."  *Id.* at 12632.  And Ford gave no indication that he knew Burks well.  Ford's antipathy toward the GDs was peppered throughout his testimony.  In one situation, a GD named "Mac New York" shot at a Vice Lord and Dowlen attempted to reconcile with Ford.  *Id.* at 12664-65.  Despite Dowlen's overture on behalf of the GDs, Ford, as leader of the Vice Lords, ordered reprisal:

> Q.    Did that actually squash that beef?
>
> A.    No. Yes and no.  From -- we always was trying to kill New York.  But --
>
> Q.    Why?
>
> A.    Just through a lot of different instances that he done throughout -- you know, time of knowing him.  And just the brothers always wanting to get at him.  Even that night, I sent a couple guys and the other high-ranking member Vice Lords sent a couple guys to shoot at him in Lincoln Homes that night.
>
> Q.    Even though you had that meeting with Mr. Dowlen earlier that day?
>
> A.    Yes.

*Id.* at 12666.  And on the night Wright was murdered, Ford testified that he instigated the fight between the GDs and Bloods:

> Q.    Did you see an opportunity here, Mr. Ford?
>
> A.    Yes.
>
> Q.    What opportunity was that?
>
> A.    Basically, I'm be honest with you, it is a sneaky shot.  Because, you know, I'm blending in with the crowd.  Like, I know, I never had a dealing with him personally.  So, like, just recognizing me, just looking at me, he wouldn't know exactly who I was.  He probably would have just thought I was another Blood.

So when I hit him, you know, it was -- I guess he probably told all them, "Yeah, I got into some fights with some Bloods."

Q.   Did you see an opportunity here to instigate an incident between the GDs and the Bloods?

A.   Yes.

Q.   And why would you want to do that?

A.   I mean, it's -- him being a GD and me being Vice Lord, it's like, how often do I catch an opportunity that – one that I don't deal with, to just get a chance to do something to 'em.

*Id.* at 12688.   On cross-examination, counsel drew out a comparison between Ford's opportunism in instigating an attack against a GD and his opportunism in testifying against a GD, Burks:

Q.   So your sister's on the phone and she says, "Hey, there's some people that got picked up in Clarksville." You start looking up who they were, right?

A.   Yes.

Q.   And you knew that those specific people that were on the internet, you read about, if you could give information about them, you could help yourself, right?

A.   Possibly, yes.

Q.   Possibly.  So how many times does an opportunity like that come along, where you thought you weren't going to testify to help yourself out, and then, all of a sudden, hey, maybe I can do this one more time?  Was that not the same situation as you found yourself in in C-Ray's that night in 2012?

A.   It's different reference, but I guess you could say that, yes.

Q.   And so here you took that opportunity, didn't you?

A.   Yes.

*Id.* at 12735-36.  Because of Ford's position as the leader of a rival gang and his admissions that he looked for and took opportunities to harm the GDs, the record contains ample support for the district court's decision to discount Ford's testimony and Burks's purported "confession." Therefore, the district court did not abuse its discretion.

Further, the majority ignores the district court's observation that, just as with Daniels and Dowlen, it is a stretch to say that Ford described a "confession."  As the district court explained,

"the jury would also have to assume that Burks was referring to Wrights' murder.  Why this would be so is not made clear by the Government."  R. 1460, PID 11822-23.  Even if "bad mother------" meant a murder charge, Ford's testimony does not implicate Burks in the murder of Wright specifically.  That Burks stated he hoped authorities would not charge him with murder might suggest that he committed a murder, or it might suggest that he was worried about the possibility of being wrongly accused.  Further, Ford did not testify that Burks ever mentioned Wright, and it is a large leap to infer that Burks's concern about a murder charge generally means that he killed Wright specifically.  Again, this is not to say that any particular conclusion is correct, but that the district court's credibility determinations and assessment of the evidence are supported by the record.  Therefore, the district court did not abuse its discretion.

### D.  Rule 33 and Witness Credibility

Under Rule 33, "[a] district court in its discretion can overturn a jury's verdict."  *Pierce*, 62 F.3d at 825.  "A reversal based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence."  *Lutz*, 154 F.3d at 589.  The majority ignores this precedent and limits the operation of Rule 33 by discarding the district court's assessment of the witnesses' credibility.  The majority cites a string of cases for the assertion "that virtually every one of our cases dealing with the weight of the evidence involves affirmances of district court denials of new trial motions."  Maj. Op. at 7.  But the fact that we have often affirmed denials of new-trial motions does not suggest that we must reverse the grant of one here, or that granting a new trial based on the district court's credibility assessments of the witnesses is forbidden.  Rather, it demonstrates the deference we must afford the decision of the district court.

As the district court accurately observed, "the only evidence even putting Burks on the scene of the murders – let alone with a gun in his hand – is the three supposed confessions."  R. 1460, PID 11817.  Therefore, the government's case that Burks murdered Wright was highly dependent on the credibility of its witnesses.  Because there was little else to review, the district court rightly focused its analysis on credibility.

The majority distinguishes the present case from *Lewis*, in which we affirmed the grant of a new trial, by asserting that the decision did not turn on credibility assessments. But the decision in *Lewis* did turn on credibility assessments. "Antun Lewis was charged with arson resulting in death." *Lewis*, 521 F. App'x at 530. As in the present case, the government's case relied primarily on witness testimony: "Marion Jackson's eyewitness testimony, the testimony of inmate informants regarding statements made by Lewis while incarcerated, and the testimony of other witnesses who knew Lewis in the community and had knowledge relating to Lewis's possible motives for committing the arson." *Id.* at 531-32. And, as in the present case, the district court found the witnesses not credible: "When evaluating the record as a whole and acting as the thirteenth juror, the district court's concerns about the credibility of Jackson, the inmate informants, and the community witnesses call into question a large portion of the government's proof." *Id.* at 532. We affirmed because the district court's credibility determinations were supported by the record:

> The district court properly evaluated the weight and credibility of all of the evidence adduced at trial and its determination that the verdict was against the manifest weight of the evidence was not an abuse of discretion. Sitting as the thirteenth juror, the district court did not abuse its discretion in concluding that many government witnesses, including Jackson, the inmate informants, and community witnesses testifying to Lewis's involvement and possible motive, were incredible. . . . Although we make no statement as to whether such proof could sustain a guilty verdict, we hold that the district court did not abuse its discretion in determining that the guilty verdict in this case was against the manifest weight of the evidence. In light of our deferential review of orders granting motions for a new trial, the district court's thorough and thoughtful review of the evidence, and its superior position to evaluate the credibility of witnesses, we affirm the judgment of the district court.

*Id.* at 541. Here, too, the district court thoroughly evaluated the credibility of the witnesses and the weight of the evidence. The district court's determinations are fully supported by record and the district court did not abuse its discretion.

The majority asserts that "[i]t's for the jury to decide how much weight to give [the] evidence" and that "what matters is that the jury had the opportunity to observe" the witnesses. Maj. Op. at 5. But, the majority is unable to explain how its novel application of Rule 33 comports with our well-established rule that in deciding a new-trial motion, a district court must

"act as the 'thirteenth juror' to 'consider *the credibility of witnesses and the weight of the evidence*.'" *Paulus*, 894 F.3d at 278 (emphasis added) (quoting *Lutz*, 154 F.3d at 589). Indeed, we concluded that remand was appropriate when a district court failed to sufficiently act as a thirteenth juror. *Id.* (remanding because, although the district court acknowledged its role as the thirteenth juror, "no detailed credibility findings or weighing of evidence ever came"). "A panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Issa v. Bradshaw*, 904 F.3d 446, 454 n.2 (6th Cir. 2018) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). Therefore, on a new-trial motion, the long-standing and proper role of the district court in assessing witness credibility as the thirteenth juror survives the majority's contrary analysis.

Finally, even under the majority's flawed application of Rule 33, the district court did not abuse its discretion. The new-trial grant was not "based on unexplained and unjustified credibility assessments of the witnesses." Maj. Op. at 6. As discussed, the district court supported its credibility assessments with specific citations to the record. Although the majority asserts that the witnesses told a consistent narrative, the district court's analysis highlights the inconsistencies in their testimonies. And the district court further relied on the paucity of physical evidence: "[L]ittle physical evidence was introduced that had any bearing on Burks' involvement or non-involvement, beyond photographs showing blood spots toward the front of the club (confirming Gaskin's testimony), and a .45 caliber casing that did not match the gun Burks was carrying when he was arrested on January 26, 2013." R. 1460, PID 11824. Because the district court explained its assessment of both the credibility of the witnesses and the physical evidence, the majority's analysis is unsupported by the record.

## II. Conclusion

In sum, "[t]he decision whether to grant a new trial is left to the sound discretion of the district court . . . ." *Pierce*, 62 F.3d at 823. When the government has presented sufficient evidence for a conviction but the district court disagrees with the jury's resolution of conflicting evidence, a new trial is appropriate on the ground that the verdict is against the manifest weight

of the evidence. *Lutz*, 154 F.3d at 589. "The court of appeals . . . does not sit as a 'thirteenth juror' to judge the credibility of witnesses. Neither do we reweigh the evidence." *Ashworth*, 836 F.2d at 266. "Our task is only to answer whether the district court abused its discretion in reviewing the new trial motion." *Dimora*, 750 F.3d at 628. Because the majority simply substitutes its assessment as the thirteenth juror for the district court's, without according the appropriate deference to the district court's assessment of the record, I dissent.