RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0142p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

                 *Plaintiff-Appellee*,

    *v.*

GREGORY VANDEMARK,

                *Defendant-Appellant*.

No. 21-3470

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:18-cr-00143-1—Michael R. Barrett, District Judge.

Argued: March 9, 2022

Decided and Filed: June 30, 2022

Before: GILMAN, STRANCH, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Patrick J. Hanley, Covington, Kentucky, for Appellant. Megan Gaffney Painter, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Patrick J. Hanley, Covington, Kentucky, for Appellant. Megan Gaffney Painter, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

NALBANDIAN, Circuit Judge. This case is about a millionaire car salesman who tried to hoodwink the IRS. Gregory VanDemark owns the Used Car Supermarket, which sells cars from two lots in Amelia, Ohio. In 2013 and 2014, VanDemark funneled away his customers' down payments and left them off his tax returns. He used this stashed-away cash to finance the

mortgage on his mansion.  The IRS caught wind soon enough.  The government charged VanDemark with crimes related to his scheme, and a jury convicted him of six counts. VanDemark moved for an acquittal on three of these counts and a new trial on all six.  The district court denied both motions.  For the reasons below, we AFFIRM.

I.

Gregory VanDemark made his fortune selling cars.  He's built something of a mini-business empire in Amelia, Ohio.  At the center of it all is the Used Car Supermarket, a C-corporation owned solely by VanDemark.  Flanking the Supermarket are VanDemark's three S-corporations: the VanDemark Group, the VanDemark Corporation, and Gregory Properties. Each supports the Supermarket in its own way.[1]  And because these are S-corporations, VanDemark must report flow-through income and deductions on his personal returns.

The Supermarket's clientele is by and large low-income and low-credit.  Customers typically finance their cars by entering into lease-to-buy agreements.  The process kicks off with a large down payment.[2]  These down payments, and VanDemark's efforts to hide them, are at the heart of this appeal.

Before 2013, everything was above board at the Supermarket on the tax front.  The Supermarket's protocols ensured all the down payments remained within the IRS's view.  To begin with, VanDemark kept a handwritten ledger at each of the two lots.  Every time a customer made a down payment, his employees recorded it in one of these ledger books.  They made sure to deposit every payment into the Supermarket's bank account as well.  Afterward, employees entered the bank receipts into an accounting software called QuickBooks.  And as a final step, VanDemark's tax preparer used the QuickBooks files to complete the necessary tax returns.

---

[1]The VanDemark Company buys salvage vehicles and fixes them up for resale by the Supermarket.  The VanDemark Group provides consulting services to the other VanDemark corporations.  Gregory Properties owns the land that's used by the various VanDemark corporations.

[2]The Supermarket used the terms "down payment" and "deposit" interchangeably: the former on its website and the latter in its lease-to-buy contracts. (R. 65, Trial Tr. (McCullough), PageID 549; R. 59, July 17, 2020 Op. & Order, PageID 246.)  For consistency, we use the former throughout.  This also reflects the fact that the Supermarket's lease-to-buy contracts functioned, in most cases, as financing agreements.  About 90 percent of lease-to-buy contracts bought out their cars in the end.

But in 2013, VanDemark began to short-circuit this process. He instructed an employee named Christopher McAfee to start stashing this cash in a safe at the main office. McAfee did as he was told. And, not surprisingly, the amount of cash deposited into the Supermarket's bank account plunged in 2013 and 2014. In 2012, VanDemark deposited $265,499.25 in cash into the account. But in 2013 and 2014, that number was much reduced to $12,194.63 and $71,150.86, respectively. Because the stashed-away cash never reached the bank account, it never made it into VanDemark's QuickBooks files. And because VanDemark's tax preparer relied on those QuickBooks files, he failed to report the cash on VanDemark's tax returns.

It turned out that VanDemark used most of this cash to pay the mortgage on his multimillion-dollar mansion. Wary of attracting the IRS's attention, VanDemark asked an employee at his bank to confirm the IRS reporting threshold. She told VanDemark that the bank had to report "[a]nything over 10,000 in cash" to the IRS. (R. 73, Trial Tr. (Luck), PageID 1086-87.) So with this information in hand, VanDemark began to make cash payments toward his mortgage several times a month, keeping each payment below $10,000.

But VanDemark's tax evasion didn't stop there. He overreported deductions on his personal returns as well. Aside from his Ohio mansion, VanDemark owned two other residences: a novelty house built in the shape of a paddleboat and an oceanfront property in Florida. VanDemark claimed construction, maintenance, and insurance expenses on these properties as business expenses for his S-corporations. He pulled this off by telling the IRS that he was building the paddleboat house as a bed and breakfast, the Florida residence was his business headquarters, and his Ohio mansion was a rental property. Thanks to these efforts, VanDemark and the Supermarket paid no federal income tax in 2013 and 2014.

Soon, all of this caught up with VanDemark. His enquiries at the bank had raised some eyebrows. The bank employee reported her conversation with VanDemark to her Bank Secrecy Act officer. This information made its way to the IRS, which deployed a special agent to investigate.

In December 2014, an IRS special agent contacted VanDemark. Posing undercover as a businessman, he expressed an interest in buying VanDemark's businesses. The pair spoke over

the phone several times. In one of these calls, VanDemark spilled the beans. He boasted that he had about "$16 million in assets" and his businesses "net over $1 million a year." (R. 90, Gov't Ex. 2, PageID 1524-25, 1546.) VanDemark all but admitted to tax evasion by explaining that he "pulled out . . . 25% of that big figure" "in the last couple of years [2013 and 2014]." (*Id.* at PageID 1549-50.) What's more, he kept track of the stashed-away 25% "just in case." (*Id.* at PageID 1551.) VanDemark let slip about his deductions as well. He admitted that he "shoved all expenses on the company" so that he wouldn't "end up paying a bunch of dang taxes." (*Id.* at PageID 1527.) And to top it all off, VanDemark confessed he was "kind of . . . giving [the agent] information [he] shouldn't even be talking about." (*Id.* at PageID 1550.)

The IRS had heard enough. In July 2016, it executed search warrants at VanDemark's three residential properties and the two Supermarket lots. Agents recovered the handwritten ledgers from the two lots. They found VanDemark at his paddleboat-shaped house and interviewed him for over three hours. He told the agents that his QuickBooks files contained all of his business records. At no point did he mention the ledger books. Asked whether he had skimmed cash from his dealership, VanDemark claimed that his employees deposited everything into the Supermarket's bank account.

Fast forward a year and a half, and a grand jury indicted VanDemark on six counts. The first four charged VanDemark with helping prepare false tax returns, in violation of 26 U.S.C. § 7206(2). Counts One and Two dealt with the Supermarket's 2013 and 2014 *corporate* returns. Counts Three and Four concerned VanDemark's 2013 and 2014 *personal* returns. Count Five charged VanDemark with structuring payments, in violation of 31 U.S.C. § 5324(a)(3). And Count Six charged VanDemark with making false statements to federal agents, in violation of 18 U.S.C. § 1001.

The trial began in March 2020. After the government rested, VanDemark made a Rule 29(a) motion for acquittal on Counts One, Two, and Three. The district court denied the motion. But VanDemark renewed it twice before the jury reached its verdict: once at the end of his case and again after the district court instructed the jury. The district court denied the motion twice more.

The trial lasted six days.  In the end, the jury found VanDemark guilty on all counts. VanDemark renewed his motion for acquittal under Rule 29(c).  He also moved for a new trial on all six of his counts under Rule 33.  In a 17-page written order, the district court denied both motions.  In May 2021, the district court entered judgment.  And now, VanDemark appeals.

## II.

"The district court's refusal to grant a motion to acquit is a legal question that we review *de novo*."  *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996).  We "must affirm the district court's decision if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  No doubt, "[t]his standard is a great obstacle to overcome." *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007).  What's more, "[t]he general hesitancy to disturb a jury verdict applies with even greater force when," as here, "a motion of acquittal has been thoroughly considered and subsequently denied by the trial judge."  *United States v. Lee*, 359 F.3d 412, 418-19 (6th Cir. 2004).

And as for VanDemark's second motion: A new trial is an extraordinary remedy for "extraordinary circumstances."  *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020) (quoting *Hughes*, 505 F.3d at 593).  Only "when the verdict exceeds the bounds of reasonableness[] should the district court order a new trial."  *Id.* at 625.  Our "review of the trial court's ruling [denying a new trial] is limited to determining whether it was a clear and manifest abuse of discretion."  *Hughes*, 505 F.3d at 593.

## III.

### A.  Motion for Acquittal: Counts One and Two

The first two counts charged VanDemark with assisting in the preparation of false corporate returns for 2013 and 2014.  VanDemark's argument begins and ends with *Commissioner v. Indianapolis Power & Light Co.*, which says that a deposit isn't taxable income

unless "the taxpayer has *some guarantee* that he will be allowed to keep the money."**[3]** 493 U.S. 203, 210 (1990) (emphasis added). VanDemark claims that the lease agreements tied the Supermarket's hands. If a customer decides not to purchase the car at the lease's end, says VanDemark, the customer can demand a refund of the down payment under the contract. And so, the argument goes, the Supermarket lacked the necessary "guarantee," and the down payments were never taxable as a threshold matter.

This argument misses the mark for two reasons. First, the Supermarket issued virtually no refunds across *decades*. The Supermarket found ways to keep these down payments at its discretion, the contract notwithstanding. And that means the down payments were taxable upon receipt consistent with *Indianapolis Power*. Second, the *Indianapolis Power* discussion is a red herring. Under VanDemark's own theory, the down payments are taxable once customers buy out their cars. At that point, the down payment applies toward the purchase price, and VanDemark cannot credibly claim that he lacks "some guarantee" of keeping it. *Indianapolis Power*, 493 U.S. at 210. Even when this happened, however, VanDemark failed to report the cash.

We begin with the Supermarket's track record on refunds. Christopher McAfee worked at the Supermarket for no fewer than 30 years. And he testified that, in those 30 years, he saw the down payment refunded "maybe, one, two, three" times total. (R. 72, Trial Tr. (McAfee), PageID 1470.) The record contains additional corroboration as well. A special agent reviewed VanDemark's ledger books from 2012 to 2014 and found only one refund. What's more, that single refund wasn't even issued at the *end of the lease* under the contract. Instead, VanDemark refunded the deposit the same day the customer paid it. Perhaps the customer changed his or her

---

**[3]**More specifically, the case involved a regulated utility that required customers with weaker credit to provide an upfront deposit. *Indianapolis Power*, 493 U.S. at 204. The customers could do one of two things with these deposits: apply them toward their bills or recoup them as a refund by showing improved credit. *Id.* at 204-05. Eligibility for the latter was determined under a fixed formula set by state regulation. *See* 170 Ind. Admin. Code § 4-1-15 (1988). A customer became eligible by "submit[ting] satisfactory payment for a period of either: (i) nine (9) successive months; or (ii) ten (10) out of any twelve (12) consecutive months without late payment in two (2) consecutive months" or "demonstrat[ing] his or her creditworthiness by any other means." *Id.* If the customer satisfied this formula, the utility had to honor its refund request—no ifs, ands, or buts. The Supreme Court held that this watertight refund requirement prevented the utility from having "complete dominion" over the deposits. *Id.* at 209-10. Thus, the deposits were not taxable upon receipt. As discussed below, the Supermarket's contracts are anything but watertight.

mind before finalizing the lease, and the Supermarket issued a refund at its discretion.[4]  In any event, that single refund had nothing to do with the contract.  This means that the contract terms forced VanDemark's hand a grand total of zero times from 2012 to 2014 (and *maybe* "one, two, three" times in 30 years).

Simply put, these numbers belie VanDemark's *Indianapolis Power* argument.  One way or another, the Supermarket engineered for itself "some guarantee" of keeping the down payments—that much is clear enough.[5]  Certainly, this conclusion is within a rational jury's reach.  VanDemark's control is shown in the contract itself and in how VanDemark applied that language.  True, the contract requires the Supermarket to refund the down payment if the customer returns the car at the end of the lease.  But that's *only if* the excess mileage fee and the cost of damages to the car do not exceed the down payment amount.

And as the district court emphasized, these variables are couched in significant ambiguities.  The Supermarket exploited them to maintain control over the down payments.  On excessive mileage, the contract imposes a fee "equal to $.50 per mile for miles to be computed at the end of the lease and balance due."  (R. 59, July, 17, 2020 Op. & Order, PageID 247.)  But importantly, the contract fails to specify a base mileage.  As a practical matter, this allows VanDemark to define the number of excess miles *after* the lease ends.[6]  This theme continues

---

[4]McAfee's testimony suggests that this sort of thing sometimes happened.  Customers would not infrequently change their minds before finalizing the paperwork.  Asked whether the Supermarket ever issued these same-day refunds at its discretion, McAfee gave an ambiguous answer: "Maybe not.  I don't know.  It just depends on the situation."  (R. 72, Trial Tr. (McAfee), PageID 1475.)  In any event, McAfee wrote "NO REFUNDS" on the deposit receipts precisely to deter customers from changing their minds mid-transaction in this way.  (*Id.* at PageID 1473-75.)

[5]VanDemark tries to parry this point by emphasizing that "at the end of the lease[,] customers normally decided to use their deposits towards the purchase of the vehicles."  (Reply at 11.)  In other words, in VanDemark's view, there were virtually no refunds because virtually everyone bought their car in the end.  But the numbers still do not add up.  True, "90 percent of the people buy [their cars] at the end of the lease."  (R. 72, Trial Tr. (McAfee), PageID 1469.)  But that still leaves a massive gap.  For the roughly 10 percent of cars that were returned across *30 years*, the Supermarket issued only "one, two, three" refunds. (*Id.* at PageID 1470.)  The point stands.

[6]VanDemark claims that customers were in fact "entitled to a [base] mileage rate of 12,000 miles per year, which is a well-known industry accepted standard annual mileage rate."  (Reply at 11.)  And so, VanDemark argues, his hands were tied when it came to the refund.  There are two problems with this argument.  First, VanDemark's only evidence here is McAfee's testimony.  And that testimony is shaky to say the least.  Asked point blank to confirm "the mileage limit for the cars that you leased," McAfee responded: "I'm not really positive on it."  (R. 72, Trial Tr. (McAfee), PageID 1469.)  Only after the government pressed further did McAfee say: "[J]ust about everybody's is about 12,000 miles a year."  (*Id.*)  The government then asked McAfee whether he was "guessing it's

with the second variable. The contract says that damages beyond "ordinary wear and tear" come out of the deposit. (*Id.*) As for calculating those costs, however, the contract places everything in VanDemark's hands. It specifies that "a representative from VANDEMARK . . . shall be the *sole judge and arbiter* as to whether or not any disputed damage is due to ordinary wear and tear or due to some other cause." (*Id.* at PageID 247 (emphasis added).) These ambiguities enable the Supermarket to jack up both variables on the back end to prevent a refund if it wishes.

The plot thickens even more from here, and not in VanDemark's favor. VanDemark argues that everything rises and falls with the contract's refund language. He doesn't dispute that once a customer converts the lease into a purchase, the refund provision no longer applies. In other words, the down payment is taxable by that point. *If only* the refund language didn't tie his hands, no doubt VanDemark would have reported everything—that's the implication of his *Indianapolis Power* argument, anyway. This begs the question: When those 2013 and 2014 leases were eventually bought out—whether in 2013, 2014, or later—did VanDemark report the down payments?

Not quite. It turns out that at least seven customers (1) began their leases in 2013 or 2014 and (2) bought out their cars *within that same window*. One of these leases ended in 2013, and the remaining six in 2014. And under VanDemark's own theory, the down payments for these leases should have appeared on the Supermarket's 2013 and 2014 returns. But they did not, which means that VanDemark fails his own test. And VanDemark says nothing about the 2013 and 2014 leases that were bought out after 2014. He could have pointed the IRS to those tax returns where he eventually reported the down payments for these leases. That way, his failure to report those payments in 2013 and 2014 becomes a timing issue that falls short of a criminal prosecution. But VanDemark did no such thing. All of this shows that he never intended to report any of the down payments, with or without *Indianapolis Power*. The district court properly denied VanDemark's acquittal motion as to Counts One and Two.

---

12,000 miles a year" or whether he "know[s] that it's a 12,000 a year." McAfee deflected: "I don't remember. I would have to read this whole [contract] to see if it's in here . . . ." (*Id.*) The contract, of course, is silent. If anything, this exchange reiterates the significant ambiguities surrounding the base mileage. Second, even if it were otherwise, the contract still leaves VanDemark with his second lever (damage costs), which he can still use to prevent a refund.

## B. Motion for Acquittal: Count Three

Count Three charged VanDemark with assisting in the preparation of a false *personal* return. VanDemark argues that "one of the elements of 26 U.S.C. Section 7206(2) is that a return has to be filed." (Appellant Br. at 41.) And because the IRS has no record of receiving VanDemark's 2013 personal return, the argument goes, VanDemark deserves an acquittal.

VanDemark's only support for this argument is an outlier from the Ninth Circuit. In *United States v. Dahlstrom*, the Ninth Circuit held that "the filing of a return is in fact an element of a section 7206(2) violation." 713 F.2d 1423, 1429 (9th Cir. 1983). But *Dahlstrom* does not get VanDemark very far.[7] For starters, the case is non-binding in our circuit. And to the extent that it conditions liability on "filing" alone, it contradicts the statute's plain meaning. Section 7206(2) imposes liability on "[a]ny person who . . . [w]illfully aids or assists in, or procures, counsels, or advises the *preparation or presentation*" of a fraudulent return. (emphasis added). It's well-established that "every word . . . is to be given effect" in a statute, and interpretations that cause words "to have no consequence" are best avoided. *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022) (quoting *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019)). We must give non-redundant meanings to "preparation" and "presentation." Not least because Congress chose to say, "preparation *or* presentation," and not "preparation *and* presentation." All this is to say that a defendant is guilty even if he helps *prepare*, without *presenting*, the fraudulent return. And it stands to reason that the act of filing the tax return falls under "presentation," but not "preparation."

In fact, other sister courts have said just that. *See United States v. McLain*, 646 F.3d 599, 604 (8th Cir. 2011) ("We agree with the district court that liability under section 7206(2) can attach even if a false return is never filed."); *United States v. Borden*, 269 F. App'x 903, 905

---

[7]*Dahlstrom*, in turn, relies on two cases: one from the Supreme Court and the other from our circuit. *See United States v. Habig*, 390 U.S. 222 (1968); *Butzman v. United States*, 205 F.2d 343 (6th Cir. 1953). At first blush, there is dicta that appears to support VanDemark. *See Habig*, 390 U.S. at 223 (noting that violations of § 7206(2) are "committed at the time the return is filed"); *Butzman*, 205 F.2d at 351 ("No crime was committed by [defendant] until the Application was filed."). But neither of these cases addressed the specific question at hand. Both involved taxpayers who filed the tax return in the end. *Habig*, 390 U.S. at 222-23; *Butzman*, 205 F.2d at 346, 351. And in that specific context, the two cases held that the limitations period began at the date of filing. *Habig*, 390 U.S. at 223; *Butzman*, 205 F.2d at 351. Indeed, this is precisely the point that the dissent made in *Dahlstrom*. 713 F.2d at 1431 (Goodwin, J., dissenting).

(11th Cir. 2008) (concluding that "the evidence [was] sufficient to sustain [defendant's] conviction" because "a person may be convicted . . . under 26 U.S.C. § 7206(2) if that person either prepares *or* presents the relevant return," and defendant "[did] not dispute her involvement in the preparation of the return in question"). We said the same thing in *United States v. Feaster*, 843 F.2d 1392, 1392 (6th Cir. 1988) (per curiam) (unpublished table decision) (holding that because the statute's text "provides that a violation occurs if a person aids, assists, counsels, or advises [in] the preparation *or* presentation of a fraudulent tax return," the filing of a tax return is not "a required element of 26 U.S.C. § 7206(2)").

And to the extent that the term "preparation" has any meaning (which it must), it encompasses these facts. VanDemark's tax preparer completed the 2013 personal return. He then tried to file it electronically, but the submission didn't go through. So he mailed the return instead, and now the IRS says that it has no record of receiving it. In other words, VanDemark, through his tax preparer, completed every step just shy of placing the return in the IRS's hands. However narrow or broad the scope of "preparation" may be, it surely applies here.[8] VanDemark's conviction for Count Three stands.[9]

## C. New Trial Motion

VanDemark also seeks a new trial on all six of his counts. This motion stands on one leg: the same argument that VanDemark raises in his motion for acquittal as to Counts One and Two. As VanDemark sees it, all six of his counts depend on the premise that some or all of the stashed-away cash was taxable to begin with. If we vacate VanDemark's conviction for Counts One and Two, he says, "[t]hat would then call all of the convictions on the other Counts into question." (Appellant Br. at 44.) But as explained above, VanDemark's arguments about Counts One and Two lack merit. And of course, that means his new trial motion no longer has a

---

[8]We leave the task of defining the precise scope of "preparation" for another day. For this appeal, it's enough for us to say that the term has *some* meaning.

[9]Perhaps VanDemark "presented" his 2013 personal return as well. After all, VanDemark apparently expected and intended that his preparer would file with the IRS. The First Circuit, for example, emphasized that it does "not equate 'filing' with 'receipt by the IRS' in a situation involving an intermediary." *United States v. Monteiro*, 871 F.2d 204, 210 (1st Cir. 1989); *see also United States v. Cutler*, 948 F.2d 691, 694-95 (10th Cir. 1991). But we need not resolve that question today.

leg to stand on. The trial court did not commit "a clear and manifest abuse of discretion," *Hughes*, 505 F.3d at 593, in determining that the verdict did not "exceed[] the bounds of reasonableness," *Burks*, 974 F.3d at 625.

## IV.

For these reasons, we AFFIRM across the board.